# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ROBERT SILVIS, | 1:07-cv-00332-LJO-GSA-PC |
|         Plaintiff, | FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS PERRY'S AND REES' MOTION FOR SUMMARY JUDGMENT BE GRANTED (Doc. 76.) |
|   v. | |
| CALIFORNIA DEPARTMENT OF CORRECTIONS, et al., | |
|         Defendants. | OBJECTIONS, IF ANY, DUE IN 30 DAYS |
| _____/ | |

## I.     RELEVANT PROCEDURAL HISTORY

Plaintiff John Robert Silvis ("Plaintiff") is a civil detainee proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's Amended Complaint, filed June 25, 2007, against defendants R. Davis, D. Smith, Denis M. Perry, Brian M. Rees, N. Weed, and J. Pappenfus for violation of the Eighth Amendment arising out of Plaintiff's medical care while incarcerated.  (Doc. 8.)

On July 26, 2010, defendants Perry and Rees ("Defendants") filed a motion for summary judgment.[1]  (Doc. 76.)  On September 17, 2010, Plaintiff filed an opposition.[2]  (Doc. 92.) Defendants did not file a reply.  Defendants' motion is now before the Court.

---

[1] Defendants Davis, Smith, Weed, and Pappenfus are represented by separate counsel.

[2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the Court in an order filed on June 6, 2008.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (Doc. 18.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.11 (1986); First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289 (1968);  Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626,

630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); <u>Lew v. Kona Hosp.</u>, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e).  Plaintiff's Amended Complaint is verified and will be considered by the Court in resolving Defendants' motion to the extent that it sets forth admissible facts.  The parties bear the burden of supporting their motions and oppositions with the papers they wish the court to consider and/or by specifically referring to any other portions of the record they wish the court to consider.  <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001).  The Court will not undertake to mine the record for triable issues of fact.  <u>Id.</u>

**III.   PLAINTIFF'S ALLEGATIONS AND CLAIMS AGAINST DEFENDANTS PERRY AND REES**

Plaintiff is a civil detainee presently housed at Coalinga State Hospital ("CSH").  From May 2002 until November 2005, Plaintiff was incarcerated at Avenal State Prison ("ASP"), where the events at issue in this action allegedly occurred.  Defendants were physicians working at ASP while Plaintiff was there.  Plaintiff alleges as follows in the Amended Complaint.

In September 1995, when Plaintiff was incarcerated at California State Prison-Sacramento, he developed a total hearing loss in his right ear and began having seizures.  He went to the prison clinic and advised medical personnel of his symptoms.  He was treated with irrigation to his right ear and ear drops.  No diagnostic tests were ordered.  His symptoms continued.

On November 23, 1995, Plaintiff experienced a severe seizure while eating dinner in the prison chow hall.  He was transported out to Folsom Mercy Hospital, and the treating emergency physician recommended that the prison arrange for him to be given a magnetic resonance imaging diagnostic test ("MRI").

1   From 1995 through 2003, Plaintiff was not given the recommended MRI.  His symptoms

2   continued to worsen, and he experienced additional seizures, dizziness, constant painful

3   headaches, and complete loss of hearing in his right ear.  He continually complained and

4   requested the MRI but was not given any diagnostic tests.

5   In 2002, Plaintiff saw Dr. Perry and Dr. Rees at ASP and informed them of his medical

6   history.  They did not order any medical testing.

7   In July 2002, Plaintiff had severe dizzy spells, migraine headaches, and longer seizures.

8   He began losing his balance and falling down.  Plaintiff saw Dr. Perry and complained of his

9   worsening condition and pain.  He was only given a cane.

10   In January 2003, Plaintiff saw Dr. Sueberry at a clinic in Delano.  Dr. Sueberry

11   recommended an MRI within 30 days with follow-up.  All of Plaintiff's symptoms were

12   worsening, including seizures, headaches, nausea, vomiting, loss of balance, loss of hearing, and

13   pain.

14   On April 1, 2003, Plaintiff was given an MRI at Coalinga Regional Medical Center.  He

15   was not told until April 29, 2003 that Dr. Peterson's report indicated he had an acoustic neuroma

16   (brain tumor), which had been growing for years and causing his physical symptoms.

17   On April 29, 2003, Plaintiff was transported to San Joaquin Community Hospital and

18   admitted by Dr. Mui.  He was told, for the first time, that he had a brain tumor.

19   On May 3, 2003, brain surgery was performed on Plaintiff by Dr. Rahimifar.  Plaintiff was

20   told that the operation was a success.  Immediately after surgery, Plaintiff experienced total facial

21   paralysis on the right side of his face.  He had to tape his eyelid shut to sleep at night.  He had to

22   drink with a straw to keep from spilling liquid on himself.  He had to use a cane to walk and

23   maintain his balance.

24   On May 7, 2003, Plaintiff received a neurological consultation from Dr. Pineda, who

25   recommended radiation to keep the brain tumor from growing back, and physical therapy for

26   Plaintiff's physical impairments.

27   ///

28   ///

4

1        On May 15, 2003, Plaintiff was returned to ASP and continued to have seizures, loss of

2   balance, complete loss of  hearing in his right ear, nausea and vomiting, migraine headaches, and

3   total paralysis on the right side of his face.

4        In May 2003, Plaintiff began writing letters and complaints to prison officials, including

5   Dr. Rees, explaining his condition and his need for radiation and physical therapy to keep his

6   tumor from growing back.  Dr. Rees never answered his letters or arranged for him to obtain the

7   treatment he needed.  Plaintiff's brain tumor began growing back.

8        On June 24, 2003, Dr. Rahimifar recommended that Plaintiff be given a hearing aid and

9   eyelid surgery, but Plaintiff never received the recommended treatments during the remainder of

10  his time in custody of the CDC.

11       On July 22, 2003, Plaintiff was seen by a physical therapist at ASP who told him to do

12  neck exercises.  He was never seen by the therapist again or any other therapist.

13       On August 19, 2003, Plaintiff was transported from ASP to Coalinga Regional Medical

14  Center for another MRI, following Dr. Rahimifar's request.

15       In December 2004, Plaintiff was told by Dr. Rahimifar that his brain tumor was growing

16  back and he needed immediate radiation treatment to be specifically performed at UC San

17  Francisco Medical Center.

18       During the remainder of 2003, 2004 and 2005, Plaintiff continued to write letters to prison

19  officials, including Dr. Perry and Dr. Rees,  requesting radiation, physical therapy, a hearing aid,

20  and eyelid surgery, without result.  Plaintiff's tumor continued to grow and he suffered physically

21  and emotionally.

22       On November 29, 2005, Plaintiff was paroled to the Riverside County Jail, and he was

23  later incarcerated at CSH.  In May 2007, Plaintiff finally started radiation treatment, and he has

24  now been provided with a hearing aid, eye patches, and physical therapy.

25       Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs

26  when they failed to provide him with adequate treatment for his symptoms caused by a brain

27  tumor.

28  ///

1

**IV.    UNDISPUTED FACTS[3]**

2
      1.      Plaintiff was at all times relevant an inmate incarcerated at ASP.

3
      2.      Dr. Rees was at all relevant times a licensed medical doctor employed at ASP with extensive medical training and experience.

4

5
      3.      Dr. Perry was at all relevant times a licensed medical doctor employed at ASP with extensive medical training and experience.

6
      4.      Plaintiff was examined and given a comprehensive workup and was diagnosed with acoustic neuroma.

7

8
      5.      Plaintiff was provided numerous diagnostic tests and evaluations and was sent on numerous occasions to outside specialists (including ear, nose and throat (ENT) specialists, neurosurgeons, and radiation specialists) for evaluation and treatment, including brain surgery.

9

10
      6.      It is Dr. Rees' and Dr. Perry's professional opinions that plaintiff received all reasonable and necessary care for his condition, consistent with community standards.

11

12

**V.    ANALYSIS**

13
      **A.    Section 1983 Actions**

14
      The Civil Rights Act under which this action was filed provides:

15
Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

16

17

18
      The statute plainly requires that there be an actual connection or link between the actions

19
of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v.

20
Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  The

21
Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional

22
right, within the meaning of section 1983, if he does an affirmative act, participates in another's

23
affirmative acts or omits to perform an act which he is legally required to do that causes the

24
deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

25
///

26

27

28

---

[3]These facts are undisputed for the sole purpose of this motion.  The Court has compiled the summary of undisputed facts from Defendants' statement of undisputed facts and Plaintiff's statements of disputed facts and undisputed facts.

1

**B.**   **Eighth Amendment Medical Claim**

2   "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

3   must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091,

4   1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)).  The two

5   part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by

6   demonstrating that 'failure to treat a prisoner's condition could result in further significant injury

7   or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need

8   was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050,

9   1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133,

10   1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate indifference is shown by

11   "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm

12   caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060).  Deliberate indifference

13   may be manifested "when prison officials deny, delay or intentionally interfere with medical

14   treatment, or it may be shown by the way in which prison physicians provide medical care." Id.

15   (citing McGuckin at 1060 (internal quotations omitted)).  Where a prisoner is alleging a delay in

16   receiving medical treatment, the delay must have led to further harm in order for the prisoner to

17   make a claim of deliberate indifference to serious medical needs. McGuckin, 974 F.2d at 1060

18   (citing Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 407 (9th Cir. 1985)).  The

19   needless suffering of pain may be sufficient to demonstrate further harm. Clement v. Gomez, 298

20   F.3d 898, 904 (9th Cir. 2002).

21   In applying this standard, the Ninth Circuit has held that before it can be said that a

22   prisoner's civil rights have been abridged, "the indifference to his medical needs must be

23   substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause

24   of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle,

25   429 U.S. at 105-06.  "[A] complaint that a physician has been negligent in diagnosing or treating a

26   medical condition does not state a valid claim of medical mistreatment under the Eighth

27   Amendment.  Medical malpractice does not become a constitutional violation merely because the

28   victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d

1   1310, 1316 (9th Cir. 1995); McGuckin, 974 F.2d at 1050, WMX Techs., 104 F.3d at 1136.  Even

2   gross negligence is insufficient to establish deliberate indifference to serious medical needs.  See

3   Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

4          "A difference of opinion between a prisoner-patient and prison medical authorities

5   regarding treatment does not give rise to a § 1983 claim," Franklin v. Oregon, 662 F.2d 1337,

6   1344 (9th Cir. 1981) (internal citation omitted), and a difference of opinion between medical

7   personnel regarding treatment does not amount to deliberate indifference.  Sanchez v. Vild, 891

8   F.2d 240, 242 (9th Cir. 1989).  To prevail, a plaintiff must set forth admissible evidence showing

9   "that the course of treatment the doctors chose was medically unacceptable under the

10  circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk

11  to [his] health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986) (internal citations

12  omitted).

13                    **1.     Defendants' Position**

14         Defendants argue that although Plaintiff may be unhappy with the medical outcome of his

15  brain tumor, he was treated appropriately, consistent with community standards, each and every

16  time his medical condition was brought to Dr. Perry's and Dr. Rees' attention and, in fact, the

17  treatment he received was extensive by any standard.  Defendants contend that Plaintiff cannot

18  establish that either Dr. Rees' or Dr. Perry's subjective state of mind was to cause him harm or

19  injury.   Defendants offer as evidence the Undisputed Facts ("UF") and the declarations of

20  defendants Dr. Perry and Dr. Rees, together with Plaintiff's medical records.

21                    **a.     Dr. Rees**

22         Defendants argue that Dr. Rees is entitled to summary judgment because he provided

23  Plaintiff with appropriate treatment.

24         At all relevant times, Dr. Rees was a licensed medical doctor employed at ASP with

25  extensive medical training and experience.  UF 2.  Dr. Rees began employment at ASP in January

26  2003 and was not assigned to the yard where Plaintiff was housed until February of 2003.  (Rees

27  Decl., Doc. 76-3 ¶5.)  Dr. Rees does not recall any medical visits he may have had with Plaintiff,

28

                              8

1  but he reviewed Plaintiff's available medical records and administrative appeal.[4]  (Rees Decl. ¶¶4,

2  5.)  The records do not reflect any visits Dr. Rees may have had with Plaintiff.  (Rees Decl. ¶5.)

3       According to the records, on March 18, 2003, Dr. Rees referred Plaintiff for an MRI

4  consultation. (Rees Decl. ¶6, Exh. A, CDCR000119.)  The impression of the April 1, 2003 MRI

5  indicated a large soft tissue mass with characteristics consistent with the diagnosis of acoustic

6  neuroma. (Rees Decl. ¶7; Exh. A, MED0042.)

7       On April 15, 2003, Dr. Rees interviewed Plaintiff in response to his appeal log no. 03-

8  0627 at the first level of review.  (Rees Decl. ¶8, Exh. A, CDCR000144-145.)  Dr. Rees partially

9  granted Plaintiff's appeal, stating that the requested MRI was completed, and that a follow-up

10  appointment and referral to the appropriate specialists (including an ENT specialist) had been

11  scheduled.  Id.  Dr. Rees also stated that not all of the details of Plaintiff's condition were known

12  and that after specialty evaluations were completed and therapy had been decided upon and

13  initiated, Plaintiff's record would be more complete. Id.

14       Acoustic neuroma (also known as acoustic swannoma) is a noncancerous, often slow-

15  growing tumor of the nerve that connects the ear to the brain.  (Rees Decl. ¶9.)  Due to where it is

16  located, it could grow fairly large with minimal or no symptoms for years.  Id.  In time, the tumor

17  could put pressure on facial and hearing nerves and eventually cause classic symptoms. Id.

18  Classic symptoms include ringing in the ears, headaches, dizziness, and/or loss of hearing.  Id.

19  The most severe symptoms occur when the tumor starts to put pressure on the brainstem or blocks

20  cerebral spinal fluid.  Id.  Plaintiff's type of tumor does not invade the brain like many other

21  tumors typically do, nor does it cause seizures. Id.

22       On April 15, 2003, Dr. Rees filled out an "urgent" Physician's Request for Services noting

23  the diagnosis as acoustic neuroma and requested a neurosurgery consultation.  (Rees Decl. ¶10,

24  Exh. A, CDCR000012 and 118.)  On April 24, 2003, Dr. Rees referred Plaintiff for an MRI of

25  mastoid temporal bones. (Rees Decl. ¶ 11, Exh. A, CDCR000013.)  On April 29, 2003, Plaintiff

26

27       [4]Attorney for Defendants was informed by CDCR that Mr. Silvis' CDCR medical file could not be located.
28  (Rees Decl. ¶4 n.1.)  Defendants did, however, receive records subpoened from Plaintiff's medical records of
providers located outside of the prison, as well as documents provided by Plaintiff.  Id.

9

was seen by Dr. Rahimifar at Adventist Health San Joaquin Community Hospital, who recommended that Plaintiff be admitted to the hospital.   (Rees Decl. ¶ 12, Exh. A, MED000089-91.)

On May 3, 2003, Dr. Rahimifar performed surgery with no complications, removing at least 80-90 percent of the tumor.  (Rees Decl. ¶14, Exh. A, MED0073-74 and MED0143.)  Dr. Pineda saw Plaintiff during his hospital stay and recommended that Plaintiff receive radiation therapy to the auditory nerve area, but did not indicate any urgency.  Id.

On May 7, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for an ENT consult appointment, and on May 13, 2003, Plaintiff underwent a physical therapy evaluation at the Adventist Health San Joaquin Community Hospital for gait training (the pattern of how a person walks).  (Rees Decl. ¶¶15, 16, Exh. A, CDCR00115 & MED0310.)

On May 19, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for Plaintiff to have an ENT consult. (Rees Decl. ¶18, Exh. A, CDCR00113.)

On May 20, 2003, and June 23, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for a follow-up appointment for Plaintiff with Dr. Rahimifar. (Rees Decl. ¶19, Exh. A, CDCR00114 & 111.)

On May 29, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for a follow-up appointment for Plaintiff with Dr. Rahimifar, who saw Plaintiff on June 24, 2003. (Rees Decl. ¶¶20, 22, Exh. A, CDCR00112 & MED0087.)

On August 14, 2003, CMO Dr. Davis approved Dr. Rees's request for a consultation for an MRI of the brain, and on August 19, 2003, the MRI impression showed scarring, residual tumor and/or fatty replacement.  (Rees Decl. ¶23, Exh. A, MED0038-39.)

On September 15, 2003, CMO Dr. Davis approved Dr. Rees's request on Plaintiff's behalf for authorization of temporary removal for medical treatment for follow-up post surgery. (Rees Decl. ¶25, Exh. A, CDCR00109.)

On September 23, 2003, Plaintiff was seen for a consultation by Dr. Leramo at Mercy Hospital in Bakersfield.  (Rees Decl. ¶26, MED0359.)  Dr. Leramo saw Plaintiff only one time

///

1    and recommended radiation treatment, but no urgency was noted.  Id.  He also noted that Plaintiff
2    would need to return to Dr. Rahimifar for follow-up with the MRI.  Id.

3         On October 3, 2003, Plaintiff was seen by an ophthalmologist for a consultation for
4    tarsoplasty (eyelid surgery). (Rees Decl. ¶27, Exh. A, MED0097.)

5         On October 16, 2003, a memorandum by CMO Dr. Davis was addressed to Plaintiff in
6    response to his September 24, 2003 letter.  (Rees Decl. ¶28, Exh. A, CDCR 000005.)  Dr. Davis
7    noted that he again reviewed Plaintiff's medical record and had made a special appointment with
8    an ENT for an evaluation and recommendations and was coordinating his care and follow-up
9    visits.  Id.  He noted that Plaintiff was evaluated by ophthalmology regarding his eyelid problem
10   and he approved the surgery to hopefully correct the problem.  Id.  Dr. Davis also noted that Dr.
11   Rahimifar and another neurosurgeon work closely together, so either one could followup with
12   Plaintiff.  Id.  Dr. Davis reviewed Plaintiff's MRI of August 19, 2003, and noted that the results
13   were very good.  Id.  He indicated that radiation treatment may be indicated as a safety measure if
14   the next evaluation indicated a need and that he would schedule this appointment if it became
15   necessary.  Id.

16        On October 28, 2003, Dr. Rees requested authorization for temporary removal for medical
17   treatment for follow-up post surgery.  (Rees Decl. ¶29, Exh. A, CDCR00108.)

18        On November 4, 2003, Plaintiff was seen by Dr. Rahimifar, who noted that if the next
19   MRI showed signs of enlargement, Plaintiff would be a candidate for gamma radiation. (Rees
20   Decl. ¶30, Exh. A, MED0369.)  He also noted that Plaintiff's eye muscles were returning, he had
21   some early return of eyelid movement, and the seventh and eighth nerve palsy were unchanged.
22   Id.  He recommended waiting a couple of months and for Plaintiff to exercise his face.  Id.  The
23   records indicate that during the exam, Plaintiff asked Dr. Rahimifar if he should consider gamma
24   radiation at this time.  Dr. Rahimifar told him that the reoccurrence of the tumor should be
25   verified before subjecting him to gamma radiation.  Id.

26        On November 24, 2003, CMO Dr. Davis signed a request for consultation for an MRI and
27   a follow-up appointment with Dr. Hulburd, ophthalmologist. (Rees Decl. ¶31, Exh. A, MED0035
28   ///

11

and CDCR00107.)  A tarsoplasty procedure for Plaintiff's right eye was scheduled for December 4, 2003.  Id.

On December 2, 2003, the MRI impression revealed there were no significant interval changes since August 19, 2003.   (Rees Decl. ¶32, Exh. A, MED0036.)

On December 22, 2003, another MRI was requested and was taken on December 30, 2003. (Rees Decl. ¶33, Exh. A, MED0032-33.)  On January 20, 2004, Dr. Rees requested an MRI follow-up and a tarsoplasty right eye follow-up.  (Rees Decl. ¶34, Exh. A, CDCR 105-106.)

On January 27, 2004, Dr. Rahimifar saw Plaintiff, noted no significant change in the size of residual versus small recurrent tumor, and recommended an MRI in May or June of 2004. (Rees Decl. ¶35, Exh. A, MED0379.)  Dr. Rahimifar discussed treatment options with Plaintiff and Plaintiff elected and agreed to have clinical follow-up and was leaning towards clinical observation only.  Id.  Dr. Rahimifar noted that Plaintiff was ready to have right eye tarsoplasty and noted that his surgical outcome at this time was very good.  Id.  Dr. Rahimifar also noted that if an MRI in May or June 2004 showed growth, then Plaintiff should have the choice of gamma radiation or surgery.  Id.

On June 4, 2004, Dr. Rees requested authorization for temporary removal for medical treatment for Plaintiff to have an MRI with contrast.  (Rees Decl. ¶36, Exh. CDCR000100-101.)

On June 8, 2004, Plaintiff saw Dr. Rahimifar, who noted that Plaintiff remained clinically stable.  (Rees Decl. ¶37, Exh. A, MED0394.)  Dr. Rahimifar noted that based on their discussion that day, Plaintiff decided against further surgery or radiation.  Id.  He only wanted clinical follow-up, which would be arranged in six months.  Id.

On June 8, 2004, the MRI was done.  (Rees Decl. ¶38, Exh. A, CDCR000153 & MED0074.)  The doctor reading the MRI told Dr. Rahimifar that it showed a ten-to-fifteen percent size tumor. Eighty to ninety percent of his tumor had been removed during surgery; thus there were no changes.  Id.  He recommended follow-up in six months.  Id.

On December 9, 2004, Dr. Rees requested a follow-up consult and on December 14, 2004, Dr. Rahimifar saw Plaintiff.  (Rees Decl. ¶39, Exh. A, MED0398 and MED0082-83.)  Dr. Rahimifar recommended an MRI, consult for gamma radiation, and tarsoplasty procedure, and

1    that an EEG (electroencephalogram) needed to be done due to nystagmus (involuntary eye

2    movement).  Id. (An electroencephalogram is a test to detect problems in the electrical activity of

3    the brain.) Id.  Dr. Rahimifar noted that he needed a consult with Dr. McDermott, a specialist for

4    gamma radiation at UCSF.  Id.  (Gamma knife radiation is intense doses of radiation given to

5    target area(s) while largely sparing the surround tissues.) Id.  The record indicates that the only

6    complaint Plaintiff had was numbness of his right lip and the corner of his mouth.  Id.  Plaintiff

7    told Dr. Rahimifar that he wanted gamma radiation.  Id.  Dr. Rahimifar went over the risks and

8    complications of gamma radiation.  Id.  Plaintiff also claimed he had not yet finalized his decision

9    regarding tarsoplasty.  Id.

10        On December 14, 2004, the MRI impression revealed a stable MRI scan—no change from

11   the prior study.  (Rees Decl. ¶40, Exh. A, CDCR000038.)

12        On December 20, 2004, Dr. Weed requested a consultation with Dr. McDermott for

13   gamma radiation.  (Rees Decl. ¶41, Exh. A, MED0092.)

14        On January 11, 2005, Dr. Weed requested an "urgent" brain MRI and MRA (magnetic

15   resonance angiography—a study to look at the cerebral vessels).  (Rees Decl. ¶44, Exh. A,

16   MED0109.)  On January 26, 2005, the MRI brain exam impression revealed subtle changes in the

17   right posterior fossa, with no clearly defined mass.  Id.

18        On February 10, 2005, Plaintiff was seen by Dr. Jacob who noted that Plaintiff attended a

19   clinic to discuss the option of gamma knife radiotherapy to treat the tumor.  (Rees Decl. ¶45, Exh.

20   A, MED0060-63.)  Dr. Jacob's recommendation was that close observation and follow-up was a

21   valid option and that if progression was seen, he would be a candidate for stereotactic

22   radiotherapy, which is a medical procedure which allows non-invasive treatment of benign and

23   malignant tumors.  Id.  Dr. Jacob's recommendation was for observation for now, which was

24   conservative treatment.  Id.  If the tumor increased, he would recommend radiation therapy.  Id.

25   There was no radiological evidence to suggest that Plaintiff indeed had progressive disease at the

26   sight of his original tumor.  Id.  Plaintiff expressed full understanding of the proposed plan.  Id.

27   Plaintiff preferred to undergo gamma knife therapy if it was feasible and indicated.  Id.

28   ///

1   On March 18, 2005, Dr. Rees requested an MRI. On March 21, 2005, the MRI showed

2   subtle (minimal) changes.  (Rees Decl. ¶46, Exh. A, CDCR00096, MED0030.)

3   A letter dated May 25, 2005, from Dr. Jacob to Dr. Weed, stated that Plaintiff had neither

4   radiological nor clinical evidence of progression of his tumor and that the right-sided cranial nerve

5   palsy remained the same since surgery, that progression of disease was a possibility, but that this

6   type of tumor showed a very slow rate of progression, which could take several months or years to

7   manifest clinically or radiologically.  (Rees Decl ¶47, Exh. A, MED068.)  The letter noted that

8   even though radiosurgery was a feasible option, the close proximity of the tumor to the brainstem

9   would make it a technically challenging procedure, with a low but definite risk of permanent

10  damage to the brainstem as a consequence.  Id.  Dr. Jacob recommended an MRI scan at least

11  once every six months along with follow-up to rule out progression and that if progression was

12  seen, Plaintiff would then be a candidate for sterotactic radiosurgery.  Id.

13  Dr. Rees's employment at Avenal State Prison ended in August 2006.  (Rees Decl. ¶5.)

14  Dr. Rees declares that at all times he tried to treat Plaintiff with dignity and respect in an

15  honest effort to treat his condition.  (Rees Decl. ¶55.)  At no time did he refuse to provide Plaintiff

16  with appropriate care of treatment, nor did he intentionally or knowingly cause Plaintiff any pain,

17  suffering, injury or harm.  Id.  In Dr. Rees' professional opinion, based on his review of Plaintiff's

18  records as well as his own observations, Plaintiff received all reasonable and necessary care for

19  his condition consistent with community standards.  Id.

20              **b.    Dr. Perry**

21  Defendants argue that Dr. Perry is entitled to summary judgment because he provided

22  Plaintiff with appropriate treatment.

23  Dr. Perry was at all relevant times a licensed medical doctor employed at ASP with

24  extensive medical training and experience.  UF 3.  On January 14, 2003, Plaintiff met with Dr.

25  Perry on a sick call visit and reported decreased hearing and ringing in his right ear for two

26  months, with dizziness for one month.  (Perry Decl., Doc. 76-4 ¶¶5, 6, Exh. A, CDCR000007 &

27  CDCR 000008.)  Plaintiff also gave a history of seizures, and Perry documented that Plaintiff had

28  nystagmus (involuntary eye movement).  (Perry Decl. ¶6, Exh. A, CDCR000007 & CDCR

14

000008.)  Dr. Perry recalls treating Plaintiff for a cerumen (ear wax) build-up prior to the January

14 visit.  Id.  Due to his symptoms apparent on January 14, Dr. Perry concluded that Plaintiff

should have an ENT consultation.  Id.  At the time of the visit, Dr. Perry had no information

suggesting that Plaintiff had any persistent ENT symptoms prior to two months before his visit of

January 14, 2003.  Id.  Plaintiff had intermittent hearing loss associated with cerumen but no

persistent symptoms.  Id.  Dr. Perry ordered lab studies, adjusted Plaintiff's dose of Paxil, and

completed an "urgent" request for services on January 14, 2003, for an ENT consultation that was

approved on the same day.  Id.  There are no other medical records indicating that Dr. Perry had

any other visits with Plaintiff after the January 14, 2003 visit.  (Perry Decl. ¶8.)  Dr. Perry was no

longer employed at Avenal State Prison after December 2003.  (Perry Decl. ¶9.)

        Dr. Perry declares that at all times he tried to treat Plaintiff with dignity and respect in an

honest effort to treat his condition.  (Perry Decl. ¶12.)  At no time did he refuse to provide

Plaintiff with appropriate care of treatment, nor did he intentionally or knowingly cause Plaintiff

any pain, suffering, injury or harm.  Id.  In Dr. Perry's professional opinion, the measures he took

in connection with Plaintiff's medical care and treatment were reasonably and medically

acceptable, and Plaintiff did not suffer any delays in being referred to a specialist.  (UF 7; Perry

Decl. ¶11)  In Dr. Perry's professional opinion, based on his review of Plaintiff's records as well

as his own observations, Plaintiff received all reasonable and necessary care for his condition

consistent with community standards. (Perry Decl. ¶12.)

        The Court finds that Defendants have met their initial burden of informing the Court of the

basis for their motion, and identifying those portions of the record which they believe demonstrate

the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish

that a genuine issue as to any material fact actually does exist. See  Matsushita, 475 U.S. at 586.

As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not

rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank,

391 U.S. at 289; Strong, 474 F.2d at 749.

1  **2.   Discussion**

2  Turning to Plaintiff's position, the Court looks to Plaintiff's opposition and verified

3  Amended Complaint.  (Doc. 8.)  The Court considers Plaintiff's medical records to the extent that

4  the records are clear and speak for themselves.  However, to the extent that interpretation of the

5  records by an expert is necessary, Plaintiff's lay opinions may not be considered.

6  Plaintiff complains that Defendants delayed in providing him appropriate medical

7  treatment.  Specifically, Plaintiff alleges that Defendants were deliberately indifferent because

8  they did not diagnose his brain tumor before April 2003, and after brain surgery was performed in

9  May 2003, they did not give Plaintiff radiation, physical therapy, eyelid surgery, or a hearing aid

10  during the time he was incarcerated at ASP, through November 19, 2005.

11  **Treatment Before Diagnosis**

12  Plaintiff alleges that since May 2000, Defendants knew about his medical history

13  beginning in 1995 – with serious symptoms including hearing loss, dizziness, seizures, impaired

14  concentration, constant headaches (with double vision and weakness), speech difficulty, vomiting,

15  clumsy walk, muscle weakness, and impaired vision – but they failed to schedule an MRI or

16  diagnose his brain tumor until April 1, 2003.[5]  (Pltf's Decl, Doc. 83 ¶¶4, 5.)  Plaintiff claims he

17  saw Dr. Rees and Dr. Perry in 2002 and informed them of all of the medical symptoms he had

18  suffered since 1995.  (ACP, Doc. 8 at 4.)[6]  The doctors did not order any medical testing.  Id.  In

19  July 2002, Plaintiff had severe dizzy spells, migraine headaches, and longer seizures.  (ACP at 5.)

20  He began losing his balance and falling down.  Id.  In July 2002, Plaintiff saw Dr. Perry and

21

22  [5]Defendants' accounts differ as to exactly when they knew of Plaintiff's extensive medical history.  Dr.
23  Perry declares that he saw Plaintiff for a cerumen (ear wax) buildup in 2002 but had no information suggesting
Plaintiff had any persistent ENT symptoms.  (Perry Decl. ¶6.)  He saw Plaintiff on January 14, 2003 and learned at
24  that time that Plaintiff had decreased hearing and a ringing in the right ear for two months,with dizziness for one
month, with nystagmus (involuntary eye movements) and a history of seizures.  Id.  Dr. Rees declares that he began
25  his employment at ASP in January 2003 and was not assigned to the yard where Plaintiff was housed until February
2003.  (Rees Decl. ¶5.)  He is unable to recall any medical visits he may have had with Plaintiff, although records
26  show that on March 18, 2003 Dr. Rees referred Plaintiff for an exam/treatment for an MRI which was performed on
April 1, 2003.  (Rees Decl. ¶¶5, 6, 7.)  On April 15, 2003, Dr. Rees interviewed Plaintiff in response to his appeal
27  and filled out an "urgent" request for services, noting the diagnosis of acoustic neuroma (brain tumor).  (Id. ¶¶8, 10.)

28  [6]When the pagination of a party's document differs from the pagination used by the Court's electronic filing
system, the Court uses the pagination of the Court's electronic filing system.

complained of his worsening condition and pain. Id. He was only given a cane. Id. On January

14, 2003, Plaintiff was seen by Dr. Rees and Dr. Perry and requested immediate diagnostic tests.

(Pltf's Decl. ¶13.) Plaintiff wrote letters to doctors at ASP, including Dr. Rees and Dr. Perry,

beginning in May 2000, describing his symptoms, without any response. (ACP at 6.) Plaintiff

was finally given an MRI on April 1, 2003, resulting in a diagnosis of acoustic neuroma (brain

tumor). (ACP at 5-6.)

Even if Defendants knew about Plaintiff's entire medical history on the day he arrived at

ASP, Plaintiff has not provided any evidence of Defendants' subjective states of mind in deciding

his medical care. "Under [the deliberate indifference] standard, the prison official must not only

'be aware of the facts from which the inference could be drawn that a substantial risk of serious

harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer v.

Brennan, 511 U.S. 825, 837 (1994). "'If a prison official should have been aware of the risk, but

was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'"

Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

Plaintiff has not shown that Defendants consciously disregarded his need for treatment, whereas

both defendants declare that they never refused to provide Plaintiff with appropriate care or

treatment, or intentionally or knowingly cause Plaintiff any pain, suffering, injury or harm. (Perry

Decl. ¶12; Rees Decl. ¶55.)

Plaintiff has not shown that he suffered further harm between 2000 and 2003 from the

delay in his diagnosis. When he arrived at ASP in 2000, five years after he began having

symptoms, he already suffered from total hearing loss in his right ear, seizures, dizziness, vertigo,

impaired concentration, double vision, weakness, speech difficulty, vomiting, and clumsy walk.

(Pltf. Decl. ¶4.) In July 2002, he reports having dizzy spells, migraine headaches, seizures, and

loss of balance with frequent falls. (ACP at 5.) In January 2003, his symptoms were worse, and

he had more frequent headaches, seizures, nausea and vomiting, loss of balance requiring use of a

cane, loss of hearing, and constant pain. Id. However, Plaintiff has not shown that he suffered

more distress as a result of the delay in diagnosis between 2000 and 2003 than he would have if

the diagnosis was made earlier. Plaintiff's own evidence shows that the diagnosis and surgery did

not alleviate his symptoms.  Even though the operation was a success, immediately after surgery and in the following days and months, he experienced total facial paralysis on the right side of his face, could not close his eyelid, and needed a cane to walk.  (ACP at 6.)   He continued to have seizures, complete loss of hearing in his right ear, nausea and vomiting, and migraine headaches.  Id.

The most Plaintiff has shown is a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment.  However, Plaintiff has not provided any evidence that the course of treatment Dr. Rees or Dr. Perry chose before his diagnosis was medically unacceptable under the circumstances.  Defendants assert that, in their professional opinions, Plaintiff received all reasonable and necessary care for his condition consistent with community standards.  ((Perry Decl. ¶12; Rees Dec. ¶55.)  As a layman, Plaintiff is not qualified to offer an opinion about whether Dr. Rees or Dr. Perry should have provided him with an MRI or other diagnostic tests before April 1, 2003.  A prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference.  Sanchez, 891 F.2d at 242.

**Treatment After Surgery**

Plaintiff claims that Defendants were deliberately indifferent because after brain surgery was performed in May 2003, they failed to give him radiation, physical therapy, eyelid surgery, or a hearing aid as recommended by Doctors Pineda, Rahimifar, and Leramo, during the time he was incarcerated at ASP.

On May 7, 2003, after his surgery, Plaintiff was visited in the hospital by Dr. G. Pineda for a neurological consultation, and Dr. Pineda recommended radiation treatment and physical therapy.  (Pltf's Decl., Doc. 83 ¶22.)  On June 24, 2003, Dr. Rahimifar recommended that Plaintiff be given a hearing aid and eyelid surgery.  (ACP at 6-7.)  On September 23, 2003, Plaintiff was seen for a consultation by Dr. Leramo at Mercy Hospital in Bakersfield, who also recommended radiation treatment for Plaintiff's remaining brain tumor.  (Pltf's Decl., Doc. 83 ¶38.)  In December 2004, Plaintiff was told by Dr. Rahimifar that his brain tumor was growing back and he needed immediate radiation treatment to be specifically performed at UC San Francisco Medical Center.  (ACP at 8.)

1   Plaintiff provides evidence that he notified Defendants of his symptoms after surgery and

2   requested treatment from them, but they refused to follow Doctors Pineda's, Rahimifar's, or

3   Leramo's recommendations.  After surgery, Plaintiff suffered many symptoms, including total

4   paralysis on the right side of his face, an eyelid that would not stay shut, dizziness, seizures,

5   memory loss, impaired concentration, constant headaches (with double vision and weakness),

6   speech difficulty, vomiting, clumsy walk, muscle weakness, and impaired vision.  (Id. ¶22.)

7   Plaintiff wrote letters to all of his doctors at ASP, including Dr. Rees and Dr. Perry, explaining his

8   medical condition and his need for radiation treatment, physical therapy, eyelid surgery, and a

9   hearing aid.  (Id. ¶¶24-27.)   However, Plaintiff was seen by only one physical therapist for one

10   visit, on July 22, 2003, who gave him two neck exercises to do.  (Id. ¶34.)  Plaintiff continued to

11   write letters to his doctors, but he never received any of the recommended treatments until after he

12   left ASP, and he never received any response to his letters from Dr. Rees or Dr. Perry.  (Id. ¶44;

13   ACP at 6.)

14   With regard to Dr. Perry, the Court finds no evidence that he knew about Plaintiff's

15   medical condition after surgery.  There are no medical records indicating that Dr. Perry had any

16   visits with Plaintiff after the January 14, 2003 visit, and Dr. Perry was no longer employed at

17   Avenal State Prison after December 2003.  (Perry Decl. ¶¶8, 9.)  Plaintiff provides no evidence

18   that Dr. Perry was involved in his medical treatment after he had surgery, and there is no evidence

19   that Dr. Perry received the letters Plaintiff claims he wrote.

20   With regard to Dr. Rees, evidence shows that he had some knowledge about Plaintiff's

21   condition after surgery.  Although there is no evidence that he met with Plaintiff after surgery,

22   records show he referred Plaintiff for medical treatment or requested authorization for Plaintiff's

23   removal for medical treatment twelve times between May 3, 2003 and March 2005, resulting in

24   further medical care for Plaintiff, including ENT consultations, a physical therapy evaluation,

25   post-surgery follow-up care, and MRI impressions to monitor the progress of Plaintiff's tumor.

26   (Rees Decl. ¶¶14, 15, 18, 19, 20, 23, 25, 29, 34, 36, 39.)   Plaintiff has not provided any evidence

27   that Dr. Rees purposely acted or failed to act in disregard of his medical needs.  Dr. Rees declares

28   that he never refused to provide Plaintiff with appropriate care or treatment, or intentionally or

knowingly caused Plaintiff any pain, suffering, injury or harm.  (Rees Decl. ¶55.)   The most

Plaintiff has shown is a difference of opinion between a prisoner-patient and prison medical

authorities, or a difference of opinion between medical personnel, regarding Plaintiff's treatment

after surgery.   Plaintiff has not provided any evidence that Dr. Rees ever acted in contradiction to

established medical practice.  Dr. Rees asserts that in his professional opinion, Plaintiff received

all reasonable and necessary care for his condition consistent with community standards.  (Rees

Dec. ¶55.)  As a layman, Plaintiff is not qualified to offer an opinion about whether Dr. Rees

should have acted to provide him with radiation, physical therapy, or other treatments after

surgery.

In light of the foregoing, the Court finds that Plaintiff has not provided admissible

evidence that Defendants acted, or failed to act, with deliberate indifference to his serious medical

needs.  Thus, the Court finds that Plaintiff has not established the existence of triable issues of

material fact as to his Eighth Amendment medical care claim against Defendants, and Defendants

are entitled to judgment as a matter of law.

## VI.     CONCLUSION AND RECOMMENDATIONS

The Court concludes that Defendants Dr. Perry and Dr. Rees are entitled to judgment as a

matter of law because Plaintiff has not established the existence of triable issues of material fact

as to his Eighth Amendment medical care claim against them.  Accordingly, the Court

RECOMMENDS that Defendants' motion for summary adjudication of the claims against them

be GRANTED.

These Findings and Recommendations shall be submitted to the United States District

Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B).

Within **thirty (30) days** after being served with a copy of these Findings and Recommendations,

any party may file written objections with the Court and serve a copy on all parties.  Such a

document should be captioned "Objections to Magistrate Judge's Findings and

///

///

///

Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the order of the district court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


     IT IS SO ORDERED.

**Dated:**  <u>**February 18, 2011**</u>          <u>     **/s/ Gary S. Austin**    </u>
                                   UNITED STATES MAGISTRATE JUDGE