1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ROBERT SILVIS, | 1:07-cv-00332-LJO-GSA-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS |
| v. | DAVIS, PAPPENFUS, WEED, AND |
| CALIFORNIA DEPARTMENT OF CORRECTIONS, et al., | SMITH'S MOTION FOR SUMMARY JUDGMENT BE GRANTED (Doc. 78.) |
| Defendants. | |
| _____/ | OBJECTIONS, IF ANY, DUE IN 20 DAYS |

## I.      RELEVANT PROCEDURAL HISTORY

Plaintiff John Robert Silvis ("Plaintiff") is a civil detainee proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's Amended Complaint, filed June 25, 2007, against defendants R. Davis, D. Smith, Denis M. Perry, Brian M. Rees, N. Weed, and J. Pappenfus for violation of the Eighth Amendment arising out of Plaintiff's medical care while incarcerated.  (Doc. 8.)

On July 26, 2010, defendants Davis, Pappenfus, Weed, and Smith ("Defendants") filed a motion for summary judgment.[1]  (Docs. 78-81.)  On August 17, 2010, Plaintiff filed an opposition.[2]  (Docs. 82-85.)  On August 31, 2010, Defendants filed a reply.  (Docs. 86-89.)  On

---

[1]Defendants Perry and Rees are represented by separate counsel.

[2]Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the Court in an order filed on June 6, 2008.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 18.)

1   September 17, 2010 and October 14, 2010, Plaintiff filed surreplies.  (Docs. 93, 96, 99, 101.)

2   Defendants' motion is now before the Court.

3   **II.    SUMMARY JUDGMENT STANDARD**

4       Summary judgment is appropriate when it is demonstrated that there exists no genuine

5   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

6   Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

7       [A]lways bears the initial responsibility of informing the district
        court of the basis for its motion, and identifying those portions of
8       "the pleadings, depositions, answers to interrogatories, and
        admissions on file, together with the affidavits, if any," which it
9       believes demonstrate the absence of a genuine issue of material fact.

10  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

11  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

12  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

13  file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

14  upon motion, against a party who fails to make a showing sufficient to establish the existence of

15  an element essential to that party's case, and on which that party will bear the burden of proof at

16  trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

17  party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary

18  judgment should be granted, "so long as whatever is before the district court demonstrates that the

19  standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

20      If the moving party meets its initial responsibility, the burden then shifts to the opposing

21  party to establish that a genuine issue as to any material fact actually does exist.  Fed. R. Civ. P.

22  56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.11 (1986);

23  First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289 (1968);  Strong v. France,

24  474 F.2d 747, 749 (9th Cir. 1973).  In attempting to establish the existence of this factual dispute,

25  the opposing party may not rely upon the denials of its pleadings, but is required to tender

26  evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

27  support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586

28  n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); <u>Lew v. Kona Hosp.</u>, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e). Plaintiff's Amended Complaint is verified and will be considered by the Court in resolving Defendants' motion to the extent that it sets forth admissible facts. The parties bear the burden of supporting their motions and oppositions with the papers they wish the court to consider and/or by specifically referring to any other portions of the record they wish the court to consider. <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to mine the record for triable issues of fact. <u>Id.</u>

## III.   PLAINTIFF'S ALLEGATIONS AND CLAIMS AGAINST DEFENDANTS DAVIS, PAPPENFUS, WEED, AND SMITH

Plaintiff is a civil detainee presently housed at Coalinga State Hospital ("CSH"). From May 2002 until November 2005, Plaintiff was incarcerated at Avenal State Prison ("ASP"), where the events at issue in this action allegedly occurred. Defendants were physicians working at ASP while Plaintiff was there. Plaintiff alleges as follows in the Amended Complaint.

In September 1995, when Plaintiff was incarcerated at California State Prison-Sacramento, he developed a total hearing loss in his right ear and began having seizures. He went to the prison clinic and advised medical personnel of his symptoms. He was treated with irrigation to his right ear and ear drops. No diagnostic tests were ordered. His symptoms continued.

On November 23, 1995, Plaintiff experienced a severe seizure while eating dinner in the prison chow hall. He was transported out to Folsom Mercy Hospital, and the treating emergency

physician recommended that the prison arrange for him to be given a magnetic resonance imaging diagnostic test ("MRI").

From 1995 through 2003, Plaintiff was not given the recommended MRI. His symptoms continued to worsen, and he experienced additional seizures, dizziness, constant painful headaches, and complete loss of hearing in his right ear. He continually complained and requested the MRI but was not given any diagnostic tests.

In 2002, Plaintiff saw Dr. Perry and Dr. Rees at ASP and informed them of his medical history. They did not order any medical testing, and he was only given a cane.

In August 2002, ASP medical staff ordered an examination by an ear, nose, and throat (ENT) medical specialist. In January 2003, Plaintiff saw Dr. Sueberry for an ENT exam at a clinic in Delano. Dr. Sueberry recommended an MRI within 30 days with follow-up. All of Plaintiff's symptoms were worsening, including seizures, headaches, nausea, vomiting, loss of balance, loss of hearing, and pain.

On April 1, 2003, Plaintiff was given an MRI at Coalinga Regional Medical Center. He was not told until April 29, 2003 that Dr. Peterson's report indicated he had an acoustic neuroma (brain tumor), which had been growing for years and causing his physical symptoms.

On April 29, 2003, Plaintiff was transported to San Joaquin Community Hospital and admitted by Dr. Mui. He was told, for the first time, that he had a brain tumor.

On May 3, 2003, brain surgery was performed on Plaintiff by Dr. Rahimifar. Plaintiff was told that the operation was a success. Immediately after surgery, Plaintiff experienced total facial paralysis on the right side of his face. He had to tape his eyelid shut to sleep at night. He had to drink with a straw to keep from spilling liquid on himself. He had to use a cane to walk and maintain his balance.

On May 7, 2003, Plaintiff received a neurological consultation from Dr. Pineda, who recommended radiation to keep the brain tumor from growing back, and physical therapy for Plaintiff's physical impairments.

///

///

On May 15, 2003, Plaintiff was returned to ASP and continued to have seizures, loss of balance, complete loss of  hearing in his right ear, nausea and vomiting, migraine headaches, and total paralysis of the right side of his face.

In May 2003, Plaintiff began writing letters and complaints to prison officials, including Dr. Davis and Dr. Pappenfus, explaining his condition and his need for radiation and physical therapy to keep his tumor from growing back.  Except for a brief response from Dr. Davis to Plaintiff's 602 appeal on July 8, 2003, prison officials never answered Plaintiff's letters or arranged for him to obtain the treatment he needed.  Plaintiff's brain tumor began growing back.

On June 24, 2003, Dr. Rahimifar recommended that Plaintiff be given a hearing aid and eyelid surgery, but Plaintiff never received the recommended treatments during the remainder of his time in custody of the CDC.

On July 22, 2003, Plaintiff was seen by a physical therapist at ASP who told him to do neck exercises.  He was never seen by the therapist again or any other therapist.

On August 19, 2003, Plaintiff was transported from ASP to Coalinga Regional Medical Center for another MRI, following Dr. Rahimifar's request.

On September 24, 2003, Plaintiff wrote letters to prison officials, including Dr. Davis, explaining that Dr. Pineda had recommended radiation for Plaintiff, and Dr. Rahimifar had recommended radiation, a hearing aid, and eyelid surgery, and requesting these treatments for his serious symptoms.

In January 2004, Plaintiff met with Dr. Rahimifar and Dr. Weed and requested radiation treatment without delay and assistance to get physical therapy.  On January 27, 2004, Plaintiff met with Dr. Rahimifar at Mercy Hospital, who told Plaintiff he needed radiation treatment without any further delay.

On August 27, 2004, Plaintiff met with Dr. Weed and requested the treatments recommended by Doctors Pineda and Rahimifar.  Dr. Weed failed to order or provide the treatment.

///

///

1    In December 2004, Plaintiff was told by Dr. Rahimifar that his brain tumor was growing

2    back and he needed immediate radiation treatment to be specifically performed at UC San

3    Francisco Medical Center.

4    During the remainder of 2003, 2004 and 2005, Plaintiff continued to write letters to prison

5    officials, including Dr. Smith, Dr. Davis, and Dr. Weed, requesting radiation, physical therapy, a

6    hearing aid, and eyelid surgery, without result.  Plaintiff's tumor continued to grow and he

7    suffered physically and emotionally.

8    On November 29, 2005, Plaintiff was paroled to the Riverside County Jail, and he was

9    later incarcerated at CSH.  In May 2007, Plaintiff finally started radiation treatment, and he has

10   now been provided with a hearing aid, eye patches, and physical therapy.

11   Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs

12   when they failed to provide him with adequate treatment for his symptoms caused by a brain

13   tumor.

14   **IV.    UNDISPUTED FACTS**[3]

15   1.    Plaintiff was incarcerated at ASP from May 18, 2000 to November 29, 2005.

16   2.    From November 1988 to approximately 2004, R. Davis, M.D. worked as Chief
           Medical Officer ("CMO") at ASP, and in that capacity, his primary job duty was to
17         supervise medical staff who provided medical care and treatment to inmates.

18   3.    From June 1991 to June 2006, J. Pappenfus, M.D. worked as a staff physician and
           surgeon at ASP.
19

20   4.    From October 1, 2003 to 2008, N. Weed, M.D. worked as a staff physician and
           surgeon at ASP.

21   5.    From September 11, 1993 to August 31, 2005, D. Smith, M.D. worked as a staff
22         physician and surgeon at ASP.

23   6.    On February 27, 2002, Dr. Smith prepared a chrono for Plaintiff indicating that he
           was fit for assignment only to those duties which were not hazardous to someone
           with seizures due to his seizure disorder, and ordered that Plaintiff be assigned to a
24         lower bunk/low tier, and was not to work at a height or near hot spots, moving
           machinery, or sharp objects.

25   ///
     ///

26

27         [3]These facts are undisputed for the sole purpose of this motion.  The Court has compiled the summary of
     undisputed facts from Defendants' statement of undisputed facts and Plaintiff's statements of disputed facts and
28   undisputed facts.

7.    On June 4, 2004, Dr. Rees requested authorization for temporary removal for medical treatment for a magnetic resonance imaging diagnostic test ("MRI") with contrast, and for follow-up consultation with neurosurgeon Dr. Rahimifar, and on June 8, 2004, Plaintiff saw Dr Rahimifar for a consultation. The request was authorized by Dr. Smith on June 7, 2004 as Acting CMO in Dr. R. Davis' absence on that date.

8.    Beyond these two events on February 27, 2002 and June 7, 2004, the records do not reflect any involvement by Dr. Smith in Plaintiff's medical care and treatment.

9.    On January 14, 2003, Plaintiff reported to Dr. Perry decreased hearing and a ringing in the right ear for two months with dizziness for one month. Plaintiff also gave Dr. Perry a history of seizures. Dr. Perry also documented for the first time that Plaintiff had nystagmus (involuntary eye movement). Dr. Perry had previously treated him for a cerumen (ear wax) build-up. Due to the symptoms now apparent, Dr. Perry was able to conclude that Plaintiff should have an ear, nose and throat ("ENT") consultation. Dr. Perry ordered lab studies, adjusted Plaintiff's dose of Paxil, and completed an "urgent" request for services on January 14, 2003, for an ENT consultation that was approved on the same day.

10.   Plaintiff was seen by Wilbur Suesberry, M.D., an ENT specialist on January 29, 2003. Plaintiff was referred with a history of vertigo and imbalance, and a hearing loss in the right ear. Plaintiff stated he has had problems with his ears for an extended period of time, which means that he has had tinnitus, and he noted a hearing loss in the right ear for an extended period of time. Dr. Suesberry recommended a CT mastoid/temporal bones and MRI of his head. Dr. Suesberry's diagnosis was unilateral hearing loss with tinnitus and vertigo.

11.   On March 18, 2003, Dr. Rees referred Plaintiff for an exam/treatment consultation for an MRI, which Dr. Davis approved and signed. The impression of the April 1, 2003 MRI stated that there was a large soft tissue mass localized to the right cerebellopontine angle with characteristics consistent with a diagnosis of acoustic neuroma (brain tumor).

12.   Dr. Rees interviewed Plaintiff on April 15, 2003, in response to his appeal log no. 03-0627 at the first level of review. Dr. Rees partially granted his appeal stating that the requested MRI was completed, and that a follow up appointment and referral to the appropriate specialists (including an ENT specialist) had been scheduled. Dr. Rees also stated that not all of the details of Plaintiff's condition were known and that after specialty evaluations were completed and therapy had been decided upon and initiated, Plaintiff's record would be more complete.

13.   Acoustic neuroma (also known as acoustic swannoma) is a noncancerous (benign) often slow-growing tumor of the nerve that connects the ear to the brain. Due to where it is located, it could grow fairly large with minimal or no symptoms for years. In time the tumor could put pressure on facial and hearing nerves and eventually cause classic symptoms. Classic symptoms include ringing in the ears, headaches, dizziness, and/or loss of hearing. The most severe symptoms occur when the tumor starts to put pressure on the brainstem or blocks cerebral spinal fluid. Plaintiff's type of tumor does not invade the brain like many other tumors typically do.

///
///
///

14.   On April 15, 2003, Dr. Rees filled out an **"urgent"** Physician's Request for Services noting the diagnosis as acoustic neuroma and requested a neurosurgery consultation.  On April 17, 2003, Dr. Davis signed a Request for Authorization of Temporary Removal for Medical Treatment for a neurosurgery consultation with Dr. Rahimifar at Adventist Health San Joaquin Community Hospital scheduled for April 29, 2003.  On April 24, 2003, a referral was made by Dr. Rees for an MRI of mastoid temporal bones, which Dr. Davis approved on April 24, 2003.

15.   On April 29, 2003, Plaintiff was seen by Dr. Rahimifar at Adventist Health San Joaquin Community Hospital.  The consultation/history stated that Plaintiff was seen by Dr. Rahimifar for surgical management of a right cerebellopontine angle mass presenting with progressive deafness since November 2002, and that he had good hearing in his left ear.  Dr. Rahimifar recommended that Plaintiff be admitted to the hospital, that the MRI of the brain be repeated with and without contrast to rule out hydrocephalus and brain stem compression, and for further evaluation.  The records indicate that Dr. Rahimifar discussed with Plaintiff the diagnosis and possible need for surgical intervention.  Arrangements for admission were made with Dr. Mui.  Dr. Rahimifar was waiting for the MRI results so that he could discuss definitive treatment with Plaintiff.

16.   Plaintiff underwent an MRI of the head which confirmed a soft tissue mass in the right cerebellopontine angle.

17.   Dr. Rahimifar had met with Plaintiff prior to surgery and gave him details of the diagnosis, and explained treatment options.  He explained the operation, risks, complications and future expectations, including possible chance of coma and facial paralysis.  Plaintiff was also informed that due to the size of the tumor, complications were higher than usual.  Plaintiff said he understood that he may need postoperative gamma radiation as well as possible future surgeries and that the chance of facial paralysis was also high.

18.   On May 3, 2003, Dr. Rahimifar performed surgery (excision of the acoustic schwannoma) with no complications.  At least over 80-90 percent of the intracapsular tumor was removed.  The capsule of the tumor, as it was stuck to the seventh and fifth nerve was left so that there would be no nerve dysfunction and inferiorly the capsule stuck to the ninth, tenth and eleventh nerve was left also.

19.   After the surgery, Plaintiff experienced some facial paralysis and difficulty closing his right eye.

20.   Dr. Pineda saw Plaintiff during the hospital stay.  Dr. Pineda recommended that Plaintiff receive radiation therapy to the auditory nerve area, but did not indicate any urgency.

21.   On May 7, 2003, Dr. Rees requested authorization of temporary removal for medical treatment for an ENT consult appointment with Dr. Rahimifar, which Dr. Davis approved and signed.

22.   On May 13, 2003, Plaintiff underwent a physical therapy evaluation at the Adventist Health San Joaquin Community Hospital for gait training.  Gait is the pattern of how a person walks.

23.   On May 14, 2003, Plaintiff was discharged from the Adventist Health San Joaquin Community Hospital.

24.     On May 19, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for an ENT consult, which Dr. Davis approved and signed.

25.     On May 20, 2003, and on June 23, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for a follow-up appointment with Dr. Rahimifar, which Dr. Davis approved and signed.

26.     On May 29, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for a follow-up appointment with Dr. Rahimifar, which Dr. Davis approved and signed.

27.     On June 4, 2003, Plaintiff saw Dr. Suesberry for an ENT consultation and his exam indicated seventh nerve paralysis, healed right occipital incision, and recommended follow-up treatment with Dr. Rahimifar.

28.     On June 19, 2003, Dr. Pappenfus prepared a chrono for Plaintiff to be medically unassigned due to his medical condition from June 19, 2003 to September 13, 2003.

29.     On June 24, 2003, Plaintiff was seen by Dr. Rahimifar for follow-up, post surgery consultation.  An assessment was completed and his plan was for ophthalmology for right tarsoplasty (a surgical procedure in which the eyelids are partially sewn together to narrow the opening), eye lubricant, a follow-up MRI, and to see Plaintiff in six months.

30.     On July 23, 2003, Dr. Pappenfus prepared a chrono for Plaintiff to be totally medically disabled due to his medical condition from July 23, 2003 to April 2, 2004.  On this date, Dr. Pappenfus also prepared a chrono for Plaintiff to have twenty minutes for each meal and to take meals back to the dorm.

31.     On August 14, 2003, Dr. Davis approved Dr. Rees' request for a consultation for an MRI of the brain.  On August 19, 2003, Plaintiff was transported from Avenal to Coalinga Regional Medical Center for another MRI, per request of the surgeon Dr. Rahimifar.  The MRI impression showed scarring, residual tumor and/or fatty replacement.

32.     On August 27, 2003, a memorandum by ASP physician Dr. Douglass to Dr. Davis indicated that he did a chart review pertaining to Plaintiff and stated that Dr. Pineda suggested that there was evidence of brainstem cerebellar involvement.  He recommended an ophthalmology consult for a right tarsoplasty, MRI of head, and follow-up with a neurosurgeon for re-evaluation of physical therapy.  Dr. Douglass also stated that Plaintiff has had several seizures.  Plaintiff's seizure medications were adjusted and he was treated with Motrin for headaches.  He was scheduled to see Dr. Rahimifar on May 10 and June 10, 2003, for follow-up dates, but the chart suggests that Dr. Rahimifar was unable to see Plaintiff on these dates.  However, he did see Plaintiff on June 24, 2003.

33.     At the June 24th appointment, Dr. Rahimifar requested an ophthalmology consult to do a right tarsoplasty.  Dr. Pappenfus completed the necessary paperwork to comply with the request.

34.     Plaintiff was evaluated by the physical therapist at ASP for treatment of his neuro deficits.

///
///

35.    On September 15, 2003, Dr. Davis approved Dr. Rees' request for authorization of temporary removal of Plaintiff for medical treatment for follow-up post surgery.

36.    On September 23, 2003, Plaintiff was seen for a consultation by Dr. Leramo at Mercy Hospital in Bakersfield.  Dr. Leramo saw Plaintiff only one time.  Dr. Leramo recommended radiation treatment, but no urgency was noted.  He also noted that Plaintiff would need to return to Dr. Rahimifar for follow up with the MRI.

37.    On October 3, 2003, Plaintiff was seen by an opthalmologist for a consultation for tarsoplasty.

38.    On or about October 16, 2003, CMO Dr. Davis drafted a memorandum to Plaintiff in response to his September 24, 2003 letter.  Dr. Davis indicated that he had again reviewed Plaintiff's medical records and had made a special appointment with an ENT for an evaluation and recommendations and was coordinating his care and follow-up visits.  He noted that Plaintiff was evaluated by ophthalmology regarding his eyelid problem and he had approved the surgery to hopefully correct the problem.  In fact, Dr. Davis had requested special permission from CDCR Central Office for the tarsoplasty procedure, which is generally considered a cosmetic procedure.  Dr. Davis also noted that Dr. Rahimifar and another neurosurgeon work together closely, so either one could follow up with Plaintiff.  Dr. Davis reviewed Plaintiff's MRI of August 19, 2003, and noted that the results were very good; as such, it was indicated that radiation treatment may be indicated as a safety measure if the next evaluation indicated a need, and that he would schedule this appointment if it became necessary.

39.    On October 28, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for follow-up post surgery, which Dr. Davis approved and signed.

40.    On November 4, 2003, Plaintiff was seen by Dr. Rahimifar for a consultation.  Dr. Rahimifar noted that if the next MRI showed signs of enlargement, Plaintiff would be a candidate for gamma radiation.  He also noted that Plaintiff's eye muscles were returning, he had some early return of eyelid movement, and the seventh and eighth nerve palsy were unchanged.  He recommended waiting a couple of months and for Plaintiff to exercise his face.  The records indicate that during the exam, Plaintiff asked Dr. Rahimifar if he should consider gamma radiation at this time.  Dr. Rahimifar told him that the reoccurrence of the tumor should be verified before subjecting him to gamma radiation.

41.    On November 24, 2003, Dr. Rees signed a request for consultation for an MRI and a follow up appointment with Dr. Hulburd, ophthalmologist, for right eye tarsoplasty scheduled for December 4, 2003.  On December 2, 2003, the MRI impression revealed there were no significant interval changes since August 19, 2003.  It also revealed a right nasal septal deviation, which is a crookedness of the wall between the nasal cavities which usually causes little or no problem.

42.    On December 22, 2003, Dr. Weed requested another MRI which was taken on December 30, 2003, without contrast which revealed grossly negative MRI, secondary to Plaintiff refusing to return for the post-contrast portion of the study.  Plaintiff reported allergies to MRI contrast.  Records reflect that protocols were put in place to prevent a contrast allergy with previous documented/suspected reactions.

43.   On January 20, 2004, Dr. Rees requested an MRI follow up and a tarsoplasty right eye follow up.  On January 27, 2004, Dr. Rahimifar saw Plaintiff for a consultation.  Dr. Rahimifar noted no significant change in size of residual versus small recurrent tumor and recommended an MRI in May or June of 2004.  Dr. Rahimifar discussed treatment options with Plaintiff and Plaintiff elected and agreed to have clinical follow-up and was leaning towards clinical observation only.  Dr. Rahimifar noted that Plaintiff was ready to have right eye tarsoplasty and noted that his surgical outcome at this time was very good.  Dr. Rahimifar also noted that if an MRI in May or June 2004 shows growth, then Plaintiff should have the choice of gamma radiation or surgery.

44.   On January 29, 2004, Dr. Weed saw Plaintiff for a follow-up with the MRI.  The MRI revealed a stable-appearing residual recurrent tumor.  Dr. Weed recommended follow-up for 6 months.

45.   On June 4, 2004, Dr. Rees requested authorization for temporary removal for medical treatment for an MRI with contrast.  The request was signed by Dr. Smith on June 7, 2004, for consultation for follow-up with films.

46.   On June 8, 2004, Plaintiff saw Dr. Rahimifar for a consultation.  Dr. Rahimifar noted that Plaintiff remains clinically stable.

47.   On June 8, 2004, the MRI was performed.  The doctor reading the MRI told Dr. Rahimifar that it showed a ten-to-fifteen percent size tumor.  Eighty-to-ninety percent of his tumor had been removed during surgery; thus there were no changes. He recommended a follow up in six months.

48.   Dr. Weed provided numerous chronos to accommodate Plaintiff's medical condition including: chronos for a double mattress, use of a cane, and lower bunk on November 4, 2004; a chrono for a special eye patch from home for Plaintiff to use on December 17, 2004; and a chrono for use of tape to close Plaintiff's right eye during sleep on February 25, 2005.

49.   On September 8, 2004, Dr. Weed responded to one of Plaintiff's appeals (Log #01793) regarding his request for an eye patch.  Dr. Weed granted his appeal and informed Plaintiff that eye patches were available at the facility medical clinic.

50.   On December 9, 2004, Dr. Rees requested a follow-up consult and on December 14, 2004, Dr. Rahimifar saw Plaintiff.  Dr. Rahimifar's impression was seventh nerve weakness and lip numbness.  He recommended an MRI, consult for gamma radiation, and tarsoplasty procedure and that an EEG (electroencephalogram) needed to be done due to nystagmus (eye movement).  (An electroencephalogram is a test to detect problems in the electrical activity of the brain.)  Dr. Rahimifar noted that he needed a consult with Dr. McDermott, a specialist for gamma radiation at UCSF.  (Gamma knife radiation is intense doses of radiation given to target area(s) while largely sparing the surround tissues.)  Plaintiff told Dr. Rahimifar that he wanted gamma radiation to shrink the remaining tumor in his head and possibly lessen his symptoms, physical handicaps, and pain.  Dr. Rahimifar went over the risks and complications of gamma radiation.  Plaintiff also claimed he had not yet finalized his decision regarding tarsoplasty.

51.   On December 14, 2004, the MRI impression revealed a stable MRI scan.  No change from prior study.

///
///

11

52. On December 20, 2004, Dr. Weed requested a consultation with Dr. McDermott for gamma radiation.

53. On January 11, 2005, Dr. Weed requested an "urgent" brain MRI and MRA (a study to look at the cerebral vessels). The medical necessity was for repeat MRI of brain with and without contrast and MRA with special attention to cerebella ponitine angle.

54. On January 26, 2005, the MRA revealed a negative impression and subtle changes in the right posterior fossa with no clearly defined mass.

55. On February 4, 2005, Dr. Weed requested a consult for gamma radiation.

56. On February 10, 2005, Plaintiff was seen by Dr. Jacob who noted that Plaintiff attended a clinic to discuss the option of gamma knife radiotherapy to treat the tumor. Dr. Jacob's recommendation was that close observation and follow-up was a valid option and that if progression was seen, he would be a candidate for stereotactic radiotherapy (a medical procedure which allows non-invasive treatment of benign and malignant tumors. Acoustic neuromas are benign or non-malignant (not cancer). Dr. Jacob's recommendation was for observation for now, which was conservative treatment. If the tumor increased, he would recommend radiation therapy. There was no radiological evidence to suggest that Plaintiff indeed had progressive disease at the sight of his original tumor. Plaintiff expressed full understanding of the proposed plan. The option of further surgery, versus observation, versus gamma knife therapy of tumor was discussed with Plaintiff. Plaintiff preferred to undergo gamma knife therapy if it was feasible and indicated.

57. On March 18, 2005, Dr. Rees requested an MRI. On March 21, 2005, the MRI showed subtle (minimal) changes.

58. On April 29, 2005, Dr. Weed requested an audiometry consultation for testing of Plaintiff's hearing ability.

59. In a letter dated May 25, 2005, written to Dr. Weed by Dr. Jacob, Dr. Jacob stated: the patient had neither radiological nor clinical evidence of progression of his tumor. The rightsided cranial nerve palsy remained the same since surgery. The progression of disease was a possibility, but this type of tumor showed a very slow rate of progression, which could take several months or years to manifest clinically or radiologically. Even though radiosurgery is a feasible option, the close proximity of the tumor to the brainstem makes it a technically challenging procedure. There is a low but definite risk of permanent damage to the brainstem as a consequence to this treatment. We recommend MRI scan at least once every six months along with follow-up to rule out progression. If progression is seen, Plaintiff would then be a candidate for sterotactic radiosurgery.

60. On July 5, 2005 and again on July 18, 2005, Dr. Weed saw Plaintiff in the clinic for complaints of vertigo and nasal congestion. He prescribed Meclizine for the vertigo on June 5, 2005 and increased the dosage on July 18, 2005.

61. In November 2005, Plaintiff was released from CDCR custody and held in the Riverside County Jail for six months. Plaintiff was transferred to CSH in April 2006 where he still currently resides.

///
///

62.  On October 31, 2006, Dr. Segal saw Plaintiff for an initial neurosurgical consultation. Plaintiff's chief complaints were facial palsy, poor balance, hearing loss, and migraine headaches. Plaintiff wished further treatment for his progressing brain tumor. At this point, Dr. Segal recommended gamma knife. The MRI from September 20, 2006 and the MRI of March 21, 2005 showed a similar-sized tumor. This showed no changes from this last MRI.

63.  On April 18, 2007, Plaintiff was seen for a gamma radiation consultation by Dr. Hysell. Plaintiff knew the risks and benefits and understood and agreed to therapy.

64.  On April 28, 2007, Plaintiff was seen for the Cyberknife initial evaluation by Dr. Wong.

65.  On May 3, 2007, the MRI impression showed no changes from the prior MRI.

66.  From May 23, 2007, to May 29, 2007, Plaintiff was treated by Dr. Misra and Dr. Wong for an acoustic neuroma with Cyberknife. End of treatment clinical comments read: Cyberknife radiosurgery for recurrent right acoustic neuroma ended successfully on May 29, 2007. Plaintiff completed his three outpatient sessions well and experienced no limiting side-effects. His care continues with Dr. Misra and at CSH.

67.  On July 11, 2007, Dr. Steven E. Hysell authored a Radiation Oncology SRS Clinic Note about Plaintiff during a clinic visit. The note states in relevant part that "Plaintiff is doing exceptionally well post-Cyberknife radiosurgery. He has decreased headaches, decreased dizziness, and increased ability to move his face. The patient states that his hearing deficit in the right ear is unchanged. Overall, his neurological conditions improved. He has no new deficits and he has done well with the Cyberknife treatment." The plan was for an MRI in two months to evaluate treatment.

68.  On November 6, 2007, the MRI impression was stable appearance to right auditory canal and cerebellopontine angle vestibular schwannoma, with both cisternal and intracanalicular components compared with a previous MRI from May 2007. The tumor was identical in contour, size, and amount of surrounding mass effect.

## V.    ANALYSIS

### A.    Section 1983 Actions

The Civil Rights Act under which this action was filed provides:

Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

The statute plainly requires that there be an actual connection or link between the actions

of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). The

Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional

1    right, within the meaning of section 1983, if he does an affirmative act, participates in another's

2    affirmative acts or omits to perform an act which he is legally required to do that causes the

3    deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

4    **B.    Eighth Amendment Medical Claim**

5    "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

6    must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091,

7    1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)).  The two

8    part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by

9    demonstrating that 'failure to treat a prisoner's condition could result in further significant injury

10   or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need

11   was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050,

12   1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133,

13   1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate indifference is shown by

14   "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm

15   caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060).  Deliberate indifference

16   may be manifested "when prison officials deny, delay or intentionally interfere with medical

17   treatment, or it may be shown by the way in which prison physicians provide medical care." Id.

18   (citing McGuckin at 1060 (internal quotations omitted)).  Where a prisoner is alleging a delay in

19   receiving medical treatment, the delay must have led to further harm in order for the prisoner to

20   make a claim of deliberate indifference to serious medical needs. McGuckin, 974 F.2d at 1060

21   (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).  The

22   needless suffering of pain may be sufficient to demonstrate further harm. Clement v. Gomez, 298

23   F.3d 898, 904 (9th Cir. 2002).

24        In applying this standard, the Ninth Circuit has held that before it can be said that a

25   prisoner's civil rights have been abridged, "the indifference to his medical needs must be

26   substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause

27   of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle,

28   429 U.S. at 105-06.  "[A] complaint that a physician has been negligent in diagnosing or treating a

medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995); McGuckin, 974 F.2d at 1050, WMX Techs., 104 F.3d at 1136. Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim," Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted), and a difference of opinion between medical personnel regarding treatment does not amount to deliberate indifference. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). To prevail, a plaintiff must set forth admissible evidence showing "that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to [his] health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986) (internal citations omitted).

### 1.   Defendants' Position

Defendants argue that their actions did not constitute deliberate indifference to Plaintiff's medical needs, because during Plaintiff's incarceration at ASP, he received extensive medical care from a number of medical personnel, including Defendants R. Davis, J. Pappenfus, N. Weed, and D. Smith, and these Defendants never intentionally or knowingly caused Plaintiff any pain, suffering, injury or harm.

Defendants offer as evidence the Undisputed Facts ("UF"); the declarations of R. Davis, J. Pappenfus, N. Weed, D. Smith, and Shanan L. Hewitt; Plaintiff's medical records; Plaintiff's depositions of April 16, 2009 and June 7, 2010; Plaintiff's response to defendant Weed's First Request to Production of Documents; defendant Weed's responses to Plaintiff's First Set of Interrogatories, and defendant Smith's response  to Plaintiff's Request for Production of Documents, Set Two.

///

1        **a.    Plaintiff's Extensive Medical Care**

2        Defendants contend that because of Plaintiff's extensive medical care, including care from

3    doctors at ASP and from outside specialists including neurosurgeons, ENT physicians, an

4    ophthalmologist, and radiologists, Plaintiff's treatment by any one of the Defendants cannot be

5    considered in a vacuum, but instead must be analyzed in the context of medical care provided by

6    multiple defendants and other medical providers.  To that end, Defendants present evidence of

7    Plaintiff's medical care from 2002 through 2007.

8        Plaintiff was incarcerated at ASP from May 18, 2000 to November 29, 2005.  UF 1.  On

9    February 27, 2002, Dr. Smith prepared a chrono for Plaintiff indicating that he was fit for

10   assignment only to those duties which were not hazardous to someone with seizures, due to

11   Plaintiff's seizure disorder, and ordered that Plaintiff be assigned to a lower bunk/low tier, and

12   was not to work at a height or near hot spots, moving machinery, or sharp objects.  UF 6.  On

13   January 14, 2003, Plaintiff reported to Dr. Perry decreased hearing and a ringing in the right ear

14   for two months with dizziness for one month.  UF 9.  Plaintiff also gave Dr. Perry a history of

15   seizures.  Id.  Dr. Perry also documented for the first time that Plaintiff had nystagmus

16   (involuntary eye movement).  Id.  Dr. Perry had previously treated him for a cerumen (ear wax)

17   build-up.  Id.  Due to the symptoms now apparent, Dr. Perry was able to conclude that Plaintiff

18   should have an ENT consultation.  Id.  At the time of the visit, Dr. Perry had no information

19   suggesting that Plaintiff had any persistent symptoms prior to two months before his visit of

20   January 14, 2003.  (Perry Decl., Doc. 76-4 ¶¶6-7; Rees Decl. Doc. 76-3 ¶¶6-7.)  Dr. Perry ordered

21   lab studies, adjusted Plaintiff's dose of Paxil, and completed an "urgent" request for services on

22   January 14, 2003, for an ENT consultation that was approved on the same day.  UF 9.

23       Plaintiff was seen by Wilbur Suesberry, M.D., an ENT specialist on January 29, 2003.  UF

24   10.  Plaintiff was referred with a history of vertigo and imbalance, and a hearing loss in the right

25   ear.  Id.  Plaintiff stated he has had problems with his ears for an extended period of time, which

26   means that he has had tinnitus, and he noted a hearing loss in the right ear for an extended period

27   of time.  Id.  Dr. Suesberry recommended a CT mastoid/temporal bones and MRI of his head.  Id.

28   Dr. Suesberry's diagnosis was unilateral hearing loss with tinnitus and vertigo.  Id.  On March 18,

2003, Dr. Rees referred Plaintiff for an exam/treatment consultation for an MRI, which Dr. Davis approved and signed. UF 11. The impression of the April 1, 2003 MRI stated that there was a large soft tissue mass localized to the right cerebellopontine angle with characteristics consistent with a diagnosis of acoustic neuroma (brain tumor). Id.

Dr. Rees interviewed Plaintiff on April 15, 2003, in response to his appeal log no. 03-0627 at the first level of review. UF 12. Dr. Rees partially granted his appeal stating that the requested MRI was completed, and that a follow up appointment and referral to the appropriate specialists (including an ENT specialist) had been scheduled. Id. Dr. Rees also stated that not all of the details of Plaintiff's condition were known and that after specialty evaluations were completed and therapy had been decided upon and initiated, Plaintiff's record would be more complete. Id.

Acoustic neuroma (also known as acoustic swannoma) is a noncancerous (benign) often slow-growing tumor of the nerve that connects the ear to the brain. UF 13. Due to where it is located, it could grow fairly large with minimal or no symptoms for years. Id. In time the tumor could put pressure on facial and hearing nerves and eventually cause classic symptoms. Id. Classic symptoms include ringing in the ears, headaches, dizziness, and/or loss of hearing. Id. The most severe symptoms occur when the tumor starts to put pressure on the brainstem or blocks cerebral spinal fluid. Id. Plaintiff's type of tumor does not invade the brain like many other tumors typically do. Id. The type of tumor that Plaintiff had does not cause seizures. (Davis Decl., Doc. 81, Exh. B ¶6; Pappenfus Decl., Doc. 81, Exh. C ¶4.)

On April 15, 2003, Dr. Rees filled out an **"urgent"** Physician's Request for Services noting the diagnosis as acoustic neuroma and requested a neurosurgery consultation. UF 14. On April 17, 2003, Dr. Davis signed a Request for Authorization of Temporary Removal for Medical Treatment for a neurosurgery consultation with Dr. Rahimifar at Adventist Health San Joaquin Community Hospital scheduled for April 29, 2003. Id. On April 24, 2003, a referral was made by Dr. Rees for an MRI of mastoid temporal bones which Dr. Davis approved on April 24, 2003. Id. On April 29, 2003, Plaintiff was seen by Dr. Rahimifar at Adventist Health San Joaquin Community Hospital. UF 15. The consultation/history stated that Plaintiff was seen by Dr. Rahimifar for surgical management of a right cerebellopontime angle mass presenting with

progressive deafness since November 2002, and that he had good hearing in his left ear.  Id.  Dr.
Rahimifar recommended that Plaintiff be admitted to the hospital, that the MRI of the brain be
repeated with and without contrast to rule out hydrocephalus and brain stem compression, and for
further evaluation.  Id.  The records indicate that Dr. Rahimifar discussed with Plaintiff the
diagnosis and possible need for surgical intervention.  Id.  Arrangements for admission were made
with Dr. Mui.  Id.  Dr. Rahimifar was waiting for the MRI results so that he could discuss
definitive treatment with Plaintiff.  Id.

Plaintiff underwent an MRI of the head which confirmed a soft tissue mass in the right
cerebellopontine angle.  UF 16.  Dr. Rahimifar had met with Plaintiff prior to surgery and gave
him details of the diagnosis, and explained treatment options.  UF 17.  He explained the operation,
risks, complications and future expectations, including possible chance of coma and facial
paralysis.  Id.  Plaintiff was also informed that due to the size of the tumor, complications were
higher than usual.  Id.  Plaintiff said he understood that he may need postoperative gamma
radiation as well as possible future surgeries and that the chance of facial paralysis was also high.
Id.

On May 3, 2003, Dr. Rahimifar performed surgery (excision of the acoustic schwannoma)
with no complications.  UF 18.  At least over eighty-to-ninety percent of the intracapsular tumor
was removed.  Id.  The capsule of the tumor, as it was stuck to the seventh and fifth nerve was left
so that there would be no nerve dysfunction and inferiorly the capsule stuck to the ninth, tenth and
eleventh nerve was left also.  Id.   Dr. Pineda saw Plaintiff during the hospital stay.  UF 20. Dr.
Pineda recommended that Plaintiff receive radiation therapy to the auditory nerve area, but did not
indicate any urgency.  Id.

On May 7, 2003, Dr. Rees requested authorization of temporary removal for medical
treatment for an ENT consult appointment with Dr. Rahimifar, which Dr. Davis approved and
signed.  UF 21.  On May 13, 2003, Plaintiff underwent a physical therapy evaluation at the
Adventist Health San Joaquin Community Hospital for gait training.  UF 22.  Gait is the pattern of
how a person walks.  Id.  On May 14, 2003, Plaintiff was discharged from the Adventist Health
San Joaquin Community Hospital.  UF 23.

On May 19, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for an ENT consult which Dr. Davis approved and signed. UF 24. On May 20, 2003, and on June 23, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for a follow-up appointment with Dr. Rahimifar which Dr. Davis approved and signed. UF 25. On May 29, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for a follow-up appointment with Dr. Rahimifar which Dr. Davis approved and signed. UF 26.

On June 4, 2003, Plaintiff saw Dr. Suesberry for an ENT consultation and his exam indicated seventh nerve paralysis, healed right occipital incision, and recommended follow-up treatment with Dr. Rahimifar. UF 27. On June 19, 2003, Dr. Pappenfus prepared a chrono for Plaintiff to be medically unassigned due to his medical condition from June 19, 2003 to September 13, 2003. UF 28. On June 24, 2003, Plaintiff was seen by Dr. Rahimifar for follow-up, post surgery consultation. An assessment was completed and his plan was for ophthalmology for right tarsoplasty, (a surgical procedure in which the eyelids are partially sewn together to narrow the opening), eye lubricant and follow up MRI, and to see Plaintiff in six months. UF 29.

On July 23, 2003, Dr. Pappenfus prepared a chrono for Plaintiff to be totally medically disabled due to his medical condition from July 23, 2003 to April 2, 2004. UF 30. On this date, Dr. Pappenfus also prepared a chrono for Plaintiff to have twenty minutes for each meal and to take meals back to the dorm. Id.

On August 14, 2003, Dr. Davis approved Dr. Rees' request for a consultation for an MRI of the brain. UF 31. On August 19, 2003, Plaintiff was transported from Avenal to Coalinga Regional Medical Center for another MRI, per request of the surgeon Dr. Rahimifar. Id. The MRI impression showed scarring, residual tumor and/or fatty replacement. Id. On August 27, 2003, a memorandum by ASP physician Dr. Douglass to Dr. Davis indicated that he did a chart review pertaining to Plaintiff and stated that Dr. Pineda suggested that there was evidence of brainstem cerebellar involvement. UF 32. He recommended an ophthalmology consult for a right tarsoplasty, MRI of head, and follow-up with a neurosurgeon for re-evaluation of physical therapy. Id. Dr. Douglass also stated that Plaintiff has had several seizures. Id. Plaintiff's seizure

medications were adjusted and he was treated with Motrin for headaches.  Id.  He was scheduled to see Dr. Rahimifar on May 10 and June 10, 2003, for follow-up dates, but the chart suggests that Dr. Rahimifar was unable to see Plaintiff on these dates.  Id.  However, he did see Plaintiff on June 24, 2003.  Id.

At the June 24th appointment, Dr. Rahimifar requested an ophthalmology consult to do a right tarsoplasty.  UF 33.  Dr. Pappenfus completed the necessary paperwork to comply with the request.  Id.  Plaintiff was evaluated by the physical therapist at ASP for treatment of his neuro deficits.  UF 34.

On September 15, 2003, Dr. Davis approved Dr. Rees' request for authorization of temporary removal of Plaintiff for medical treatment for follow-up post surgery.  UF 35.  On September 23, 2003, Plaintiff was seen for a consultation by Dr. Leramo at Mercy Hospital in Bakersfield.  UF 36.  Dr. Leramo saw Plaintiff only one time.  Id.  Dr. Leramo recommended radiation treatment, but no urgency was noted.  Id.  He also noted that Plaintiff would need to return to Dr. Rahimifar for follow up with the MRI.  Id.  On October 3, 2003, Plaintiff was seen by an opthalmologist for a consultation for tarsoplasty.  UF 37.

On or about October 16, 2003, CMO Dr. Davis drafted a memorandum to Plaintiff in response to his September 24, 2003 letter.  UF 38.  Dr. Davis indicated that he had again reviewed Plaintiff's medical records and had made a special appointment with an ENT for an evaluation and recommendations and was coordinating his care and follow-up visits.  Id.  He noted that Plaintiff was evaluated by ophthalmology regarding his eyelid problem and he had approved the surgery to hopefully correct the problem.  Id.  In fact, Dr. Davis had requested special permission from CDCR Central Office for the tarsoplasty procedure which is generally considered a cosmetic procedure.  Id.  Dr. Davis also noted that Dr. Rahimifar and another neurosurgeon work together closely, so either one could follow up with Plaintiff.  Id.  Dr. Davis reviewed Plaintiff's MRI of August 19, 2003, and noted that the results were very good; as such, it was indicated that radiation treatment may be indicated as a safety measure if the next evaluation indicated a need, and that he would schedule this appointment if it became necessary.  Id.

///

1    On October 28, 2003, Dr. Rees requested authorization for temporary removal for medical

2    treatment for follow-up post surgery which Dr. Davis approved and signed. UF 39. On

3    November 4, 2003, Plaintiff was seen by Dr. Rahimifar for a consultation. UF 40. Dr. Rahimifar

4    noted that if the next MRI showed signs of enlargement, Plaintiff would be a candidate for gamma

5    radiation. Id. He also noted that Plaintiff's eye muscles were returning, he had some early return

6    of eyelid movement, and the seventh and eighth nerve palsy were unchanged. Id. He

7    recommended waiting a couple of months and for Plaintiff to exercise his face. Id. The records

8    indicate that during the exam, Plaintiff asked Dr. Rahimifar if he should consider gamma

9    radiation at this time. Id. Dr. Rahimifar told him that the reoccurrence of the tumor should be

10   verified before subjecting him to gamma radiation. Id.

11   On November 24, 2003, Dr. Rees signed a request for consultation for an MRI and a

12   follow-up appointment with Dr. Hulburd, ophthalmologist, for right eye tarsoplasty scheduled for

13   December 4, 2003. UF 41. On December 2, 2003, the MRI impression revealed there were no

14   significant interval changes since August 19, 2003. Id. It also revealed a right nasal septal

15   deviation, which is a crookedness of the wall between the nasal cavities which usually causes little

16   or no problem. Id. On December 22, 2003, Dr. Weed requested another MRI which was taken on

17   December 30, 2003, without contrast, which revealed grossly negative MRI, secondary to Plaintiff

18   refusing to return for the post-contrast portion of the study. UF 42. Plaintiff reported allergies to

19   MRI contrast. Id. Records reflect that protocols were put in place to prevent a contrast allergy

20   with previous documented/suspected reactions. Id.

21   On January 20, 2004, Dr. Rees requested an MRI follow up and a tarsoplasty right eye

22   follow up. UF 43. On January 27, 2004, Dr. Rahimifar saw Plaintiff for a consultation. Id. Dr.

23   Rahimifar noted no significant change in size of residual versus small recurrent tumor and

24   recommended an MRI in May or June of 2004. Id. Dr. Rahimifar discussed treatment options

25   with Plaintiff and Plaintiff elected and agreed to have clinical follow up and was leaning towards

26   clinical observation only. Id. Dr. Rahimifar noted that Plaintiff was ready to have right eye

27   tarsoplasty and noted that his surgical outcome at this time was very good. Id. Dr. Rahimifar also

28   ///

noted that if an MRI in May or June 2004 shows growth, then Plaintiff should have the choice of gamma radiation or surgery.  Id.

On January 29, 2004, Dr. Weed saw Plaintiff for a follow-up with the MRI.  UF 44.  The MRI revealed a stable-appearing residual recurrent tumor.  Id.  Plaintiff decided against surgery and radiation for now.  (Davis Decl., Doc. 81, Exh. B ¶¶31-21; Pappenfus Dec., Doc. 81, Exh. C ¶¶31-33; Pltf's Response to Dr. Weed's Request for Production of Documents, Set One, Doc. 81, Exh. F at 5.)  Dr. Weed recommended follow-up for 6 months.  UF 44.

On June 4, 2004, Dr. Rees requested authorization for temporary removal for medical treatment for an MRI with contrast.  UF 45.  The request was signed by Dr. Smith on June 7, 2004, for consultation for follow up with films.  Id.  On June 8, 2004, Plaintiff saw Dr. Rahimifar for a consultation.  UF 46.  Dr. Rahimifar noted that Plaintiff remains clinically stable.  Id.  Dr. Rahimifar also noted that based on the current discussion this day, Plaintiff decided against further surgery or radiation and only wanted clinical follow-up which will be arranged in six months.  (Davis Decl., Doc. 81, Exh. A ¶¶33-35; Pappenfus Decl., Doc. 81, Exh. C ¶¶34-36; Exh. A to Deft's MSJ, Doc. 79 at 48.)  On June 8, 2004, the MRI was performed.  UF 46.  The doctor reading the MRI told Dr. Rahimifar that it showed a ten-to-fifteen percent size tumor.  Id.  Eighty-to-ninety percent of his tumor had been removed during surgery; thus there were no changes.  Id.  He recommended a follow up in six months.

Dr. Weed provided numerous chronos to accommodate Plaintiff's medical condition including: chronos for a double mattress, use of a cane, and lower bunk on November 4, 2004; a chrono for a special eye patch from home for Plaintiff to use on December 17, 2004; and a chrono for use of tape to close Plaintiff's right eye during sleep on February 25, 2005.  UF 48.  On September 8, 2004, Dr. Weed responded to one of Plaintiff's appeals (Log #01793) regarding his request for an eye patch.  UF 49.  Dr. Weed granted his appeal and informed Plaintiff that eye patches were available at the facility medical clinic.  Id.

On December 9, 2004, Dr. Rees requested a follow-up consult and on December 14, 2004, Dr. Rahimifar saw Plaintiff.  UF 50.  Dr. Rahimifar's impression was seventh nerve weakness and lip numbness.  Id.  He recommended an MRI, consult for gamma radiation, and tarsoplasty

procedure and that an EEG (electroencephalogram) needed to be done due to nystagmus (eye

movement).  Id. (An electroencephalogram is a test to detect problems in the electrical activity of

the brain.) Id. Dr. Rahimifar noted that he needed a consult with Dr. McDermott, a specialist for

gamma radiation at UCSF.  Id. (Gamma knife radiation is intense doses of radiation given to

target area(s) while largely sparing the surround tissues.) Id. Plaintiff told Dr. Rahimifar that he

wanted gamma radiation to shrink the remaining tumor in his head and possibly lessen his

symptoms, physical handicaps, and pain.  Id. Dr. Rahimifar went over the risks and complications

of gamma radiation.  Id. Plaintiff's only complaint was numbness of right lip and corner of

mouth, and Plaintiff denied any new neurological symptoms.  (Davis Decl., Doc. 81, Exh. B ¶¶36-

38; Pappenfus Dec., Doc. 81, Exh. C ¶¶37-39.)  Plaintiff also claimed he had not yet finalized his

decision regarding tarsoplasty.  Id. On December 14, 2004, the MRI impression revealed a stable

MRI scan.  Id. No change from prior study.  UF 51.  On December 20, 2004, Dr. Weed requested

a consultation with Dr. McDermott for gamma radiation.  UF 52.

On January 11, 2005, Dr. Weed requested an "urgent" brain MRI and MRA  (a study to

look at the cerebral vessels).  UF 53.  The medical necessity was for repeat MRI of the brain with

and without contrast and MRA with special attention to cerebella ponitine angle.  Id. On January

26, 2005, the MRA revealed a negative impression and subtle changes in the right posterior fossa

with no clearly defined mass.  UF 54.

On February 4, 2005, Dr. Weed requested a consult for gamma radiation.  UF 55.  On

February 10, 2005, Plaintiff was seen by Dr. Jacob who noted that Plaintiff attended a clinic to

discuss the option of gamma knife radiotherapy to treat the tumor.  UF 56.  Dr. Jacob's

recommendation was that close observation and follow up was a valid option and that if

progression was seen, he would be a candidate for stereotactic radiotherapy (a medical procedure

which allows non-invasive treatment of benign and malignant tumors.  Id. Acoustic neuromas are

benign or non-malignant (not cancer).  Id. Dr. Jacob's recommendation was for observation for

now, which was conservative treatment.  Id. If the tumor increased, he would recommend

radiation therapy.  Id. There was no radiological evidence to suggest that Plaintiff indeed had

progressive disease at the sight of his original tumor.  Id. Plaintiff expressed full understanding of

the proposed plan.  Id.  The option of further surgery, versus observation, versus gamma knife

therapy of tumor was discussed with Plaintiff.  Id.  Plaintiff preferred to undergo gamma knife

therapy if it was feasible and indicated.  Id.

On March 18, 2005, Dr. Rees requested an MRI.  UF 57.  On March 21, 2005, the MRI

showed subtle (minimal) changes.  Id.  On April 29, 2005, Dr. Weed requested an audiometry

consultation for testing of Plaintiff's hearing ability.  UF 58.

In a letter dated May 25, 2005, written to Dr. Weed by Dr. Jacob, Dr. Jacob stated: the

patient had neither radiological nor clinical evidence of progression of his tumor.  UF 59.  The

rightsided cranial nerve palsy remained the same since surgery.  Id.  The progression of disease

was a possibility, but this type of tumor showed a very slow rate of progression, which could take

several months or years to manifest clinically or radiologically.  Id.  Even though radiosurgery is a

feasible option, the close proximity of the tumor to the brainstem makes it a technically

challenging procedure.  Id.  There is a low but definite risk of permanent damage to the brainstem

as a consequence to this treatment.  Id.  We recommend an MRI scan at least once every six

months along with follow-up to rule out progression.  Id.  If progression is seen, Plaintiff would

then be a candidate for sterotactic radiosurgery.  Id.

On July 5, 2005 and again on July 18, 2005, Dr. Weed saw Plaintiff in the clinic for

complaints of vertigo and nasal congestion.  UF 60.  He prescribed Meclizine for the vertigo on

June 5, 2005 and increased the dosage on July 18, 2005.  Id.

In November 2005, Plaintiff was released from CDCR custody and held in the Riverside

County Jail for six months.  UF 61.  Plaintiff was transferred to CSH in April 2006 where he still

currently resides.  Id.

On October 31, 2006, Dr. Segal saw Plaintiff for an initial neurosurgical consultation.  UF

62.  Plaintiff's chief complaints were facial palsy, poor balance, hearing loss, and migraine

headaches.  Id.  Plaintiff wished further treatment for his progressing brain tumor.  Id.  At this

point, Dr. Segal recommended gamma knife.  Id.  The MRI from September 20, 2006 and the

MRI of March 21, 2005 showed a similar-sized tumor.  Id.  This showed no changes from this last

MRI.  Id.

1   On April 18, 2007, Plaintiff was seen for a gamma radiation consultation by Dr. Hysell.

2   UF 63.  Plaintiff knew the risks and benefits and understood and agreed to therapy.  Id.  On April

3   28, 2007, Plaintiff was seen for the Cyberknife initial evaluation by Dr. Wong.  UF 64.  On May

4   3, 2007, the MRI impression showed no changes from the prior MRI.  UF 65.

5   From May 23, 2007 to May 29, 2007, Plaintiff was treated by Dr. Misra and Dr. Wong for

6   an acoustic neuroma with Cyberknife.  UF 66.  End of treatment clinical comments read:

7   Cyberknife radiosurgery for recurrent right acoustic neuroma ended successfully on May 29,

8   2007.  Id.  Plaintiff completed his three outpatient sessions well and experienced no limiting side-

9   effects.  Id.  His care continues with Dr. Misra and at CSH.  Id.

10   On July 11, 2007, Dr. Steven E. Hysell authored a Radiation Oncology SRS Clinic Note

11   about Plaintiff during a clinic visit.  UF 67.  The note states in relevant part that "Plaintiff is doing

12   exceptionally well post-Cyberknife radiosurgery.  Id.  He has decreased headaches, decreased

13   dizziness, and increased ability to move his face.  Id.  The patient states that his hearing deficit in

14   the right ear is unchanged.  Id.  Overall, his neurological conditions improved.  Id.  He has no new

15   deficits and he has done well with the Cyberknife treatment."  Id.  The plan was for an MRI in two

16   months to evaluate treatment.  Id.

17   On November 6, 2007, the MRI impression was stable appearance to right auditory canal

18   and cerebellopontine angle vestibular schwannoma, with both cisternal and intracanalicular

19   components compared with a previous MRI from May 2007.  UF 68.  The tumor was identical in

20   contour, size, and amount of surrounding mass effect.  Id.

21   Defendants claim they never intentionally or deliberately delayed in providing Plaintiff

22   with medical care and/or treatment.  (Davis Dec., Doc. 81, Exh. B ¶52; Pappenfus Decl., Doc. 81,

23   Exh. C ¶54; Smith Decl., Doc. 81, Exh. D ¶7.)  Defendants assert they never intentionally or

24   deliberately disregarded any known risk and/or serious injury of Plaintiff.  Id.  Defendants also

25   assert that they did not intentionally or knowingly cause Plaintiff any pain, suffering, injury or

26   harm, and that they were, at all times, motivated by a genuine concern for Plaintiff's health and

27   well-being, as well as that of the other inmates they served.  Id.

28   ///

1          **b.    Dr. Davis**

2          Defendants argue that Dr. Davis is entitled to summary judgment because he provided

3  Plaintiff with appropriate treatment.

4          From November 1988 to approximately 2004, R. Davis, M.D. worked as Chief Medical

5  Officer ("CMO") at Avenal State Prison, and in that capacity, his primary job duty was to

6  supervise medical staff who provided medical care and treatment to inmates.  UF 2.

7          On March 18, 2003, Dr. Rees referred Plaintiff for an exam/treatment consultation for an

8  MRI, which Dr. Davis approved and signed.  UF 11.  On April 17, 2003, Dr. Davis signed a

9  Request for Authorization of Temporary Removal for Medical Treatment for a neurosurgery

10 consultation with Dr. Rahimifar at Adventist Health San Joaquin Community Hospital scheduled

11 for April 29, 2003.  UF 14.  On April 24, 2003, a referral was made by Dr. Rees for an MRI of

12 mastoid temporal bones, which Dr. Davis approved on April 24, 2003.  Id.

13         On May 3, 2003, brain surgery was performed on Plaintiff by Dr. Rahimifar.   UF 18.  On

14 May 7, 2003, Dr. Rees requested authorization of temporary removal for medical treatment for an

15 ENT consult appointment with Dr. Rahimifar, which Dr. Davis approved and signed.  UF 21.  On

16 May 19, 2003, Dr. Rees requested authorization for temporary removal for medical treatment for

17 an ENT consult, which Dr. Davis approved and signed.  UF 24.  On May 20, 2003, May 29, 2003,

18 and June 23, 2003, Dr. Rees requested authorization for temporary removal for medical treatment

19 for a follow up appointment with Dr. Rahimifar, which Dr. Davis approved and signed.  UF 25,

20 26.  On August 14, 2003, Dr. Davis approved Dr. Rees' request for a consultation for an MRI of

21 the brain, and on August 19, 2003, Plaintiff was transported from Avenal to Coalinga Regional

22 Medical Center for an MRI.  UF 31.

23         On August 27, 2003, a memorandum by ASP physician Dr. Douglass to Dr. Davis

24 indicated that he did a chart review pertaining to Plaintiff and stated that Dr. Pineda suggested that

25 there was evidence of brainstem cerebellar involvement.  UF 32.  Dr. Douglass recommended an

26 ophthalmology consult for a right tarsoplasty, MRI of head, and follow-up with a neurosurgeon

27 for re-evaluation of physical therapy.  Id.  Dr. Douglass also stated that Plaintiff has had several

28 ///

1  seizures; Plaintiff's seizure medications were adjusted and he was treated with Motrin for

2  headaches. Id.

3      On September 15, 2003, Dr. Davis approved Dr. Rees' request for authorization of

4  temporary removal of Plaintiff for medical treatment for follow-up post surgery, and on

5  September 23, 2003, Plaintiff was seen for a consultation by Dr. Leramo at Mercy Hospital in

6  Bakersfield.  UF 35, 36.

7      On or about October 16, 2003, CMO Dr. Davis drafted a memorandum to Plaintiff in

8  response to his September 24, 2003 letter.  UF 38.  Dr. Davis indicated that he had again reviewed

9  Plaintiff's medical records and had made a special appointment with an ENT for an evaluation

10 and recommendations and was coordinating his care and follow-up visits.  Id.  He noted that

11 Plaintiff was evaluated by ophthalmology regarding his eyelid problem and he had approved the

12 surgery to hopefully correct the problem.  Id.  In fact, Dr. Davis had requested special permission

13 from CDCR Central Office for the tarsoplasty procedure, which is generally considered a

14 cosmetic procedure.  Id.  Dr. Davis also noted that Dr. Rahimifar and another neurosurgeon work

15 together closely, so either one could follow up with Plaintiff.  Id.  Dr. Davis reviewed Plaintiff's

16 MRI of August 19, 2003, and noted that the results were very good; as such, it was indicated that

17 radiation treatment may be indicated as a safety measure if the next evaluation indicated a need,

18 and that he would schedule this appointment if it became necessary.  Id.

19     On October 28, 2003, Dr. Rees requested authorization for temporary removal for medical

20 treatment for follow-up post surgery, which Dr. Davis approved and signed, and on November 4,

21 2003, Plaintiff was seen by Dr. Rahimifar for a consultation.  UF 39, 40.

22     Dr. Davis declares that he never intentionally or deliberately delayed in providing Plaintiff

23 with medical care and/or treatment.  (Davis Decl., Doc. 81, Exh. B ¶52.)  Dr. Davis declares that

24 he never intentionally or deliberately disregarded any known risk and/or serious injury of Plaintiff.

25 Id.  Dr. Davis also asserts that he did not intentionally or knowingly cause Plaintiff any pain,

26 suffering, injury or harm, and that he was, at all times, motivated by a genuine concern for

27 Plaintiff's health and well-being, as well as that of the other inmates he served.  Id.

28 ///

1

        **c.**    <u>**Dr. Pappenfus**</u>

2           Defendants argue that Dr. Pappenfus is entitled to summary judgment because he provided

3   Plaintiff with appropriate treatment.

4           From June 1991 to June 2006, J. Pappenfus, M.D. worked as a staff physician and surgeon

5   at ASP.  UF 3.  On June 19, 2003, Dr. Pappenfus prepared a chrono for Plaintiff to be medically

6   unassigned due to his medical condition from June 19, 2003 to September 13, 2003.  UF 28.  On

7   July 23, 2003, Dr. Pappenfus prepared a chrono for Plaintiff to be totally medically disabled due

8   to his medical condition from July 23, 2003 to April 2, 2004.  UF 30.  On this date, Dr. Pappenfus

9   also prepared a chrono for Plaintiff to have twenty minutes for each meal and to take meals back

10  to the dorm.  <u>Id.</u>  At Plaintiff's appointment with Dr. Rahimifar on June 24, 2003, the doctor

11  requested an ophthalmology consult to do a right tarsoplasty, and Dr. Pappenfus completed the

12  necessary paperwork to comply with the request.  UF 33.

13          Dr. Pappenfus declares that he never intentionally or deliberately delayed in providing

14  Plaintiff with medical care and/or treatment.  (Pappenfus Decl., Doc. 81, Exh. C ¶54.)  Dr.

15  Pappenfus declares that he never intentionally or deliberately disregarded any known risk and/or

16  serious injury of Plaintiff.  <u>Id.</u>  Dr. Pappenfus also asserts that he did not intentionally or

17  knowingly cause Plaintiff any pain, suffering, injury or harm, and that he was, at all times,

18  motivated by a genuine concern for Plaintiff's health and well-being, as well as that of the other

19  inmates he served.  <u>Id.</u>

20

        **d.**    <u>**Dr. Weed**</u>

21          Defendants argue that Dr. Weed is entitled to summary judgment because he provided

22  Plaintiff with appropriate treatment.

23          From October 1, 2003 to 2008, N. Weed, M.D. worked as a staff physician and surgeon at

24  ASP.  UF 4.  On December 22, 2003, Dr. Weed requested an MRI for Plaintiff which was taken

25  on December 30, 2003, without contrast which revealed grossly negative MRI, secondary to

26  Plaintiff refusing to return for the post-contrast portion of the study.  UF 42.  Plaintiff reported

27  allergies to MRI contrast.  <u>Id.</u>  Records reflect that protocols were put in place to prevent a

28  contrast allergy with previous documented/suspected reactions.  <u>Id.</u>

On January 20, 2004, Plaintiff had an MRI and on January 29, 2004, Dr. Weed saw Plaintiff for a follow-up with the MRI.  UF 44.  The MRI revealed a stable-appearing residual recurrent tumor.  Id.  Dr. Weed recommended follow-up for 6 months.  Id.

Dr. Weed provided numerous chronos to accommodate Plaintiff's medical condition including: chronos for a double mattress, use of a cane, and lower bunk on November 4, 2004; a chrono for special eye patch from home for Plaintiff to use on December 17, 2004; and a chrono for use of tape to close Plaintiff's right eye during sleep on February 25, 2005.  UF 48.  On September 8, 2004, Dr. Weed responded to one of Plaintiff's appeals (Log #01793) regarding his request for an eye patch.  UF 49.  Dr. Weed granted his appeal and informed Plaintiff that eye patches were available at the facility medical clinic.  Id.

On December 20, 2004, Dr. Weed requested a consultation with Dr. McDermott for gamma radiation.  UF 52.  On January 11, 2005, Dr. Weed requested an "urgent" brain MRI and MRA (a study to look at the cerebral vessels).  UF 53.  The medical necessity was for repeat MRI of brain with and without contrast and MRA with special attention to cerebella ponitine angle.  Id.  On January 26, 2005, the MRA revealed a negative impression and subtle changes in the right posterior fossa with no clearly defined mass.  UF 54.  On February 4, 2005, Dr. Weed requested a consult for gamma radiation, and on February 10, 2005, Plaintiff was seen by Dr. Jacob who noted that Plaintiff attended a clinic to discuss the option of gamma knife radiotherapy to treat the tumor.  UF 55, 56.

On April 29, 2005, Dr. Weed requested an audiometry consultation for testing of Plaintiff's hearing ability.  UF 58.  In a letter dated May 25, 2005, written to Dr. Weed by Dr. Jacob, Dr. Jacob stated: the patient had neither radiological nor clinical evidence of progression of his tumor.  UF. 59.

On July 5, 2005 and again on July 18, 2005, Dr. Weed saw Plaintiff in the clinic for complaints of vertigo and nasal congestion.  UF 60.  He prescribed Meclizine for the vertigo on July 5, 2005 and increased the dosage on July 18, 2005.  Id.

///

///

1          **e.    Dr. Smith**

2          From September 11, 1993 to August 31, 2005, D. Smith, M.D. worked as a staff physician

3     and surgeon at ASP.  UF 5.

4          On February 27, 2002, Dr. Smith prepared a chrono for Plaintiff indicating that he was fit

5     for assignment only to those duties which were not hazardous to someone with seizures, due to his

6     seizure disorder, and ordered that Plaintiff be assigned to a lower bunk/low tier, and was not to

7     work at a height or near hot spots, moving machinery, or sharp objects.  UF 6.  On June 4, 2004,

8     Dr. Rees requested authorization for temporary removal for medical treatment for a magnetic

9     resonance imaging diagnostic test ("MRI") with contrast, and for follow-up consultation with

10    neurosurgeon Dr. Rahimifar, and on June 8, 2004, Plaintiff saw Dr Rahimifar for a consultation.

11    UF 7.  The request was authorized by Dr. Smith on June 7, 2004 as Acting CMO in Dr. R. Davis'

12    absence on that date.  Id.  Beyond these two events on February 27, 2002 and June 7, 2004, the

13    records do not reflect any involvement by Dr. Smith in Plaintiff's medical care and treatment.  UF

14    8.

15         Dr. Smith declares that he never intentionally or deliberately delayed in providing Plaintiff

16    with medical care and/or treatment.  (Smith Decl., Doc. 81, Exh. D ¶7.)  Dr. Smith declares that

17    he never intentionally or deliberately disregarded any known risk and/or serious injury of Plaintiff.

18    Id.  Dr. Smith also asserts that he did not intentionally or knowingly cause Plaintiff any pain,

19    suffering, injury or harm, and that he was, at all times, motivated by a genuine concern for

20    Plaintiff's health and well-being, as well as that of the other inmates he served.  Id.

21         The Court finds that Defendants have met their initial burden of informing the Court of the

22    basis for their motion, and identifying those portions of the record which they believe demonstrate

23    the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish

24    that a genuine issue as to any material fact actually does exist.  See  Matsushita, 475 U.S. at 586.

25    As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not

26    rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of

27    specific facts in the form of affidavits, and/or admissible discovery material, in support of its

28    ///

1   contention that the dispute exists.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank</u>,

2   391 U.S. at 289; <u>Strong</u>, 474 F.2d at 749.

3               **2.      Discussion**

4           Turning to Plaintiff's position, the Court looks to Plaintiff's opposition and verified

5   Amended Complaint.  (Doc. 8.)  The Court considers Plaintiff's medical records to the extent that

6   the records are clear and speak for themselves.  However, to the extent that interpretation of the

7   records by an expert is necessary, Plaintiff's lay opinions may not be considered.

8           Plaintiff complains that Defendants delayed in providing him appropriate medical

9   treatment.  Specifically, Plaintiff alleges that Defendants were deliberately indifferent because

10  they did not diagnose his brain tumor before April 2003, and after brain surgery was performed in

11  May 2003, they did not give Plaintiff radiation, physical therapy, eyelid surgery, or a hearing aid

12  during the time he was incarcerated at ASP, through November 19, 2005.

13          **Treatment Before Diagnosis**

14          Plaintiff alleges that since May 2000, Defendants knew about his medical history dating

15  back to 1995 – with serious symptoms including hearing loss, dizziness, seizures, impaired

16  concentration, constant headaches (with double vision and weakness), speech difficulty, vomiting,

17  clumsy walk, muscle weakness, and impaired vision – but they failed to schedule an MRI or

18  diagnose his brain tumor until April 1, 2003.  (Pltf's Decl, Doc. 83 ¶¶4, 5.)  Plaintiff claims that

19  upon his transfer to ASP on May 18, 2000, he immediately and repeatedly requested from

20  Defendants both verbally and in writing that he be provided with diagnostic tests to determine the

21  origin of his medical problems and symptoms so that he could be properly treated.  <u>Id.</u> ¶8-11.

22  Plaintiff asserts that he informed Defendants that he suspected a brain tumor was responsible for

23  his symptoms, but he was not provided with any diagnostic tests or a hearing aid.  <u>Id.</u>  After

24  meeting with Dr. Perry in January 2003, Plaintiff was finally given an MRI on April 1, 2003,

25  resulting in a diagnosis of acoustic neuroma (brain tumor).  (UF 9-11; ACP at 5-6.)

26          Dr. Weed could not have known of Plaintiff's condition before his April 1, 2003

27  diagnosis, because Dr. Weed did not begin working at ASP until October 1, 2003.  UF 4.  There is

28  also no evidence that Dr. Pappenfus was involved in Plaintiff's medical care in any way before

31

1    Plaintiff's diagnosis.  There is also no evidence that any of the letters Plaintiff claims he wrote,

2    informing doctors at ASP of his symptoms and requesting treatment, were received by any of the

3    Defendants before Plaintiff's April 1, 2003 diagnosis.

4         However, it appears that Dr. Smith must have known about Plaintiff's seizure disorder as

5    early as February 2002, when he prepared a chrono for Plaintiff limiting Plaintiff's assignments

6    due to his seizure disorder.  In addition, Dr. Davis must have known about Plaintiff's condition on

7    March 18, 2003 when he approved a referral from Dr. Rees for Plaintiff to receive an MRI.  UF 6,

8    11.  Even so, Plaintiff has not provided any evidence of these two Defendants' subjective states of

9    mind in deciding his medical care.  "Under [the deliberate indifference] standard, the prison

10   official must not only 'be aware of the facts from which the inference could be drawn that a

11   substantial risk of serious harm exists,' but that person 'must also draw the inference.'"  Id. at

12   1057 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994).  "'If a prison official should have

13   been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no

14   matter how severe the risk.'"  Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175,

15   1188 (9th Cir. 2002)).  Plaintiff has not shown that any of the Defendants consciously disregarded

16   his need for treatment, whereas Doctors Davis, Pappenfus, and Smith declare that they never

17   refused to provide Plaintiff with appropriate care or treatment, or intentionally or knowingly cause

18   Plaintiff any pain, suffering, injury or harm.  (Davis Decl., Doc. 81, Exh. B ¶52; Pappenfus Decl.,

19   Doc. 81, Exh. C ¶54; Smith Decl., Doc. 81, Exh. D ¶7. )

20        Plaintiff has not shown that he suffered further harm between 2000 and 2003 from the

21   delay in his diagnosis.  When he arrived at ASP in 2000, five years after he began having

22   symptoms, he already suffered from total hearing loss in his right ear, seizures, dizziness, vertigo,

23   impaired concentration, double vision, weakness, speech difficulty, vomiting, and clumsy walk.

24   (Pltf. Decl., Doc. 83 ¶4.)  In July 2002, he reports having dizzy spells, migraine headaches,

25   seizures, and loss of balance with frequent falls.  (ACP at 5.)  In January 2003, his symptoms were

26   worse, and he had more frequent headaches, seizures, nausea and vomiting, loss of balance

27   requiring use of a cane, loss of hearing, and constant pain.  Id.  However, Plaintiff has not shown

28   that he suffered more distress as a result of the delay in diagnosis between 2000 and 2003 than he

would have if the diagnosis was made earlier.  Plaintiff's own evidence shows that the diagnosis and surgery did not alleviate his symptoms.  Even though the operation was a success, immediately after surgery and in the following days and months, he experienced total facial paralysis on the right side of his face, could not close his eyelid, and needed a cane to walk.  (ACP at 6.)  He continued to have seizures, complete loss of hearing in his right ear, nausea and vomiting, and migraine headaches.  Id.

The most Plaintiff has shown is a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment.  However, Plaintiff has not provided any admissible evidence that the course of treatment Defendants chose before his diagnosis was medically unacceptable under the circumstances.  As a layman, Plaintiff is not qualified to offer an opinion about whether Defendants should have provided him with an MRI or other diagnostic tests before April 1, 2003.  A prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference.  Sanchez, 891 F.2d at 242.

**Treatment After Surgery**

Plaintiff claims that Defendants were deliberately indifferent because after brain surgery was performed in May 2003, they failed to give him radiation, physical therapy, eyelid surgery, or a hearing aid as recommended by Doctors Pineda, Rahimifar and Leramo, during the time he was incarcerated at ASP.

On May 7, 2003, after his surgery, Plaintiff was visited in the hospital by Dr. G. Pineda for a neurological consultation, and Dr. Pineda recommended radiation treatment and physical therapy.  (Pltf's Decl., Doc. 83 ¶22.)  On June 24, 2003, Dr. Rahimifar recommended that Plaintiff be given a hearing aid and eyelid surgery.  (ACP at 6-7.)  On September 23, 2003, Plaintiff was seen for a consultation by Dr. Leramo at Mercy Hospital in Bakersfield, who also recommended radiation treatment for Plaintiff's remaining brain tumor.  (Pltf's Decl., Doc. 83 ¶38.)  In December 2004, Plaintiff was told by Dr. Rahimifar that his brain tumor was growing back and he needed immediate radiation treatment, to be specifically performed at UC San Francisco Medical Center.  (ACP at 8.)

///

1    Plaintiff provides evidence that he notified all of the Defendants of his symptoms after

2    surgery and requested treatment from them, but they refused to follow Doctors Pineda's,

3    Rahimifar's, or Leramo's recommendations.  After surgery, Plaintiff suffered many symptoms,

4    including total paralysis on the right side of his face, an eyelid that would not stay shut, dizziness,

5    seizures, memory loss, impaired concentration, constant headaches (with double vision and

6    weakness), speech difficulty, vomiting, clumsy walk, muscle weakness, and impaired vision.  (Id.

7    ¶22.)  Plaintiff told all of the Defendants repeatedly that he wanted the radiation treatment

8    recommended by Doctors Pineda and Leramo.  (Id. ¶23.)  Plaintiff never told any of the

9    Defendants that he did not want gamma radiation treatment on the remaining brain tumor and

10   surrounding tissues and nerves.  Id.  Plaintiff wrote letters to all of his doctors at ASP, including

11   Doctors Davis, Pappenfus, Weed, and Smith, explaining his medical condition and his need for

12   radiation treatment, physical therapy, eyelid surgery, and a hearing aid.  (Id. ¶¶24-30.)  Plaintiff

13   was seen by only one physical therapist for one visit, on July 22, 2003, who gave him two neck

14   exercises to do.  (Id. ¶34.)  On August 27, 2003, Dr. Davis indicated that he reviewed Plaintiff's

15   chart and stated that Dr. Pineda noted evidence of brainstem cerebellar involvement of Plaintiff's

16   tumor.  (Id. ¶37.)  In January 2004 and August 2004, Plaintiff met with Dr. Weed and requested

17   immediate radiation treatment as recommended by Dr. Pineda, and assistance in obtaining

18   physical therapy.  Id. ¶¶37, 41.  Dr. Weed did not order either of the treatments.  Id.  Plaintiff

19   continued to write letters to his doctors, but he never received any of the recommended treatments

20   until after he left ASP, and he never received any response to his letters except for a brief response

21   by Dr. Davis to his appeal on July 8, 2003.  (Id. ¶44; ACP at 6.)

22       The Court finds evidence that all of the Defendants had some knowledge about Plaintiff's

23   medical condition after surgery, participated in his medical care, and did not provide Plaintiff with

24   radiation treatment or prolonged physical therapy he requested.

25       With regard to Dr. Davis, although there is no evidence that he met with Plaintiff after

26   surgery, it is undisputed that he authorized Plaintiff's removal for treatment eight times between

27   May 7, 2003 and October 28, 2003, resulting in further medical care for Plaintiff, including ENT

28   consultations, post-surgery follow-up care, and MRI impressions to monitor the progress of

Plaintiff's tumor.  UF 21, 24, 25, 26, R31, 35, 39.  On October 16, 2003, Dr. Davis drafted a memorandum in response to Plaintiff's September 24, 2003 letter, indicating he had reviewed Plaintiff's medical records and was coordinating his care and follow-up visits.  UF 38.

It is undisputed that on June 19, 2003 and July 23, 2003, Dr. Pappenfus prepared chronos for Plaintiff to be medically unassigned until September 13, 2003, to be totally medically disabled until April 2, 2004, and to be allowed extra privileges at mealtime, due to his medical condition.  UF 30.  On June 24, 2003, Dr. Pappenfus completed the paperwork for Plaintiff's ophthalmology consultation.  UF 33.

It is undisputed that Dr. Weed requested an MRI for Plaintiff on December 22, 2003 and followed up on January 29, 2004.  UF 42, 44.  Dr. Weed also prepared medical chronos for Plaintiff, granted Plaintiff's appeal for eye patches, requested consultations for radiation and audiometry, requested an MRI and MRA, and treated Plaintiff for verdigo.  UF 48, 49, 52, 53, 55, 58, 60.

It is also undisputed that Dr. Smith was involved on two occasions with Plaintiff's medical care, when he prepared a medical chrono for Plaintiff on February 27, 2004, and when he authorized Plaintiff's removal for treatment on June 7, 2004.  UF 6, 7.

Plaintiff has not provided any evidence that any of the Defendants purposely acted or failed to act in disregard of his medical needs.  Dr. Davis, Dr. Pappenfus, and Dr. Smith declare that they never intentionally or deliberately delayed in providing Plaintiff with medical care and/or treatment or disregarded any known risk and/or serious injury of Plaintiff, and they were always motivated by a genuine concern for Plaintiff's health and well-being.   (Davis Decl., Doc. 81, Exh. B ¶52; Pappenfus Decl., Doc. 81, Exh. C ¶54; Smith Decl., Doc. 81, Exh. D ¶7.)

The most Plaintiff has shown is a difference of opinion between a prisoner-patient and prison medical authorities, or a difference of opinion between medical personnel, regarding Plaintiff's treatment after surgery.  Plaintiff has not provided any admissible evidence that Defendants ever acted in contradiction to established medical practice.  As a layman, Plaintiff is not qualified to offer an opinion about whether Defendants should have acted to provide him with radiation, physical therapy, or other treatments after surgery.

In light of the foregoing, the Court finds that Plaintiff has not provided admissible evidence that Defendants acted, or failed to act, with deliberate indifference to his serious medical needs.  Thus, the Court finds that Plaintiff has not established the existence of triable issues of material fact as to his Eighth Amendment medical care claim against Defendants Dr. R. Davis, Dr. D. Smith, Dr. N. Weed, and Dr. J. Pappenfus, and that these four Defendants are entitled to judgment as a matter of law.

### C.   <u>Qualified Immunity</u>

Defendants argue that they are entitled to qualified immunity.  Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 815 (2009), and protects "all but the plainly incompetent or those who knowingly violate the law," <u>Malley v. Briggs</u>, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986).

In resolving a claim of qualified immunity, courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001); <u>McSherry v. City of Long Beach</u>, 560 F.3d 1125, 1129-30 (9th Cir. 2009).  While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances. <u>Pearson</u>, 129 S.Ct. at 818 (overruling holding in <u>Saucier</u> that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); <u>McSherry</u>, 560 F.3d at 1130.

As discussed above, the Court finds that Defendants did not violate Plaintiff's constitutional rights.  Therefore, the issue of qualified immunity shall not be addressed.

///

///

# VI.    RECOMMENDATIONS AND CONCLUSION

The Court concludes that Defendants  Dr. R. Davis, Dr. D. Smith, Dr. N. Weed, and Dr. J. Pappenfus are entitled to judgment as a matter of law because Plaintiff has not established the existence of triable issues of material fact as to his Eighth Amendment medical care claim against them.  Accordingly, the Court RECOMMENDS that Defendants' motion for summary adjudication of the claims against them be GRANTED.

These Findings and Recommendations shall be submitted to the United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B). Within **twenty (20) days** after being served with a copy of these Findings and Recommendations, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the order of the district court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:    February 24, 2011**              **/s/ Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE

37